AMERICAN CEMENT CORPORATION,
a corporation, Libelant,

v.

HEALY TIBBITTS CONSTRUCTION
COMPANY, a corporation,
Respondent.

HEALY TIBBITTS CONSTRUCTION
COMPANY, a corporation,
Petitioner,

v.

GARVIN TOWBOAT AND BARGE COM-
PANY, a corporation, and American Ce-
ment Corporation, a corporation, Third-
Party Respondents.

No. 64–1260.

United States District Court
S. D. California,
Central Division.

Feb. 7, 1966.

---

Lillick, Geary, McHose & Roethke,
Lawrence D. Bradley, Jr., Los Angeles,
Cal., for libelant and third-party respond-
ent American Cement Corp.

Overton, Lyman & Prince, Dan Bren-
nan and Jerome O. Hughey, Los Angeles,
Cal., for respondent and petitioner Healy
Tibbitts Const. Co.

McCutchen, Black, Verleger & Shea,
Howard J. Privett and James W. Car-
penter, Los Angeles, Cal., for third-party
respondent Garvin Towboat & Barge Co.

THURMOND CLARKE, District Judge.

This action arises out of loss of part of a cargo of rock from a barge under tow, and consequent damage to the vessel.

Libelant and third-party respondent American Cement Corporation (referred to herein as "American") was vendor of the rock and owner of the barge. Respondent and petitioner Healy Tibbitts Construction Company ("Healy Tibbitts") was purchaser of the rock. Third-party respondent Garvin Towboat and Barge Company ("Garvin") was owner of the tugboat.

Healy Tibbitts entered into a contract with the Department of Fish and Game of the State of California for construction of artificial fish reefs off Imperial Beach Pier on the Southern California coast. The firm then contracted with American for purchase of 3600 tons of two- to three-ton rock from American's quarry on Catalina Island. American agreed to furnish and load two barges to transport the rock. Delivery was to be "F.O.B. barges Catalina."

Graham Barge No. 41, the one this action concerns, is a wooden vessel with a steel deck. Employees of American loaded it with 1966 tons of rock at the quarry. Under a contract entered into by Healy Tibbitts and Garvin, the tug GARVIN then took the barge in tow and proceeded toward Imperial Beach.

As tug and tow neared the job site and the towboat began to shorten its line, the barge listed sharply. Despite efforts to right the vessel, it listed still farther and spilled most of its cargo into the sea. The barge itself was heavily damaged.

By the present action, American seeks to recover damages for the cost of repair to the barge, for a marine surveyor's services, and for loss of use of the vessel. It seeks also to recover sums alleged to be due from Healy Tibbitts for materials sold and barges chartered.

Healy Tibbitts seeks to recover from Garvin for indemnity for any liability the former may have incurred for damage to the barge, including surveyor's fee and loss of use. It has cross-libeled Garvin and American for loss of the rock cargo owned by Healy Tibbitts at the time of the casualty.

American seeks indemnity from Garvin for any liability of American to Healy Tibbitts, and alleges direct liability of Garvin to American for damage to the barge, including surveyor's fee and loss of use.

Healy Tibbitts argues loss of the cargo resulted from one or more of three factors: unseaworthiness of the barge, improper loading by American, and negligence of Garvin.

American maintains the tug was seaworthy, and the casualty resulted from inevitable accident. Garvin denies any unseaworthiness of the tug and any negligence on its part.

The first problem confronting the court is the nature of the agreement between American and Healy Tibbitts for use of the barge. Was this a demise or bare-boat charter as American urges, or a time charter?

Barge No. 41 had no motive power of its own; after loading the vessel, employees of American took no further part in its voyage. Completion of the trip necessarily depended upon outside assistance, furnished in this instance by a towing company contracted by the charterer.

■ Under these facts the court finds the arrangement was a bare-boat charter by which Healy Tibbitts became the owner *pro hac vice*.

■ This relationship does not render Healy Tibbitts an insurer. It does impose liability for damage *unless* the charterer can show the damage resulted despite due care on its part and on the part of the tugboat company which the charterer engaged. The C. W. Crane, 155 F.2d 940 (2d Cir. 1946).

■ Where unseaworthiness has been demonstrated, the court may presume it was the proximate cause of an otherwise unexplained casualty; but the fact of a casualty alone does not connote negligence nor unseaworthiness. Walston v. Lambertsen, 349 F.2d 660 (9th Cir. 1965), cert. denied January 17, 1966, 86 S.Ct. 553.

There is evidence the barge was in less than mint condition at the outset of the voyage: a hopper had been damaged, there was some degree of dry rot, the deck and the bulwarks were in need of repair. Barge No. 41 was a working vessel, employed in the heavy and untidy business of carrying rock. Wear and tear were inevitable.

■ The vessel had two or three inches of water in the bilge at the beginning of the voyage. This amount of leakage, particularly in a wooden vessel, does not render it unseaworthy. New England Foundation Co. v. Rugo Const. Co., 60 F.Supp. 143 (D.Mass.1945), aff'd 172 F.2d 964 (1st Cir. 1949). After the casualty, there were two feet of water in the bilge. Presence of the larger quantity of water is ascribed to the accident itself.

American loaded the barge at its quarry. Weight of the load was within capacity of the vessel. The load line was above water, and the weight was greater in the stern. George Garvin, captain of the tug and a veteran of 50 years at sea, described the loading as "perfect."

The rocks being irregular, they did not fit tightly together, and the top of the load was uneven. Various witnesses estimated the highest point was eight to 12 feet above the two-foot bulwarks.

Captain Garvin estimated the rock was piled eight to nine feet high at the topmost point. James Taylor, a deck engineer for Healy Tibbitts, who was present at the time of the casualty, estimated the height at nine to 10 feet. Dragutin Domac, a marine and cargo surveyor, made an estimate of 12 feet on the basis of photographs shown him.

Domac testified a vessel may be characterized as "stiff" or "tender" in regard to stability. A stiff vessel has a low center of gravity and a short period of roll; it has little tendency to shift its cargo. However, stress on the hull is greater than that on the hull of a tender vessel.

The witness described Barge No. 41 as tender, and testified this characteristic would be accentuated as the deck cargo was increased. He testified Barge No. 41 was not seaworthy with the type of load it carried.

Domac calculated the vessel's period of roll at 152 seconds. This figure varies widely (and inexplicably) from a figure of 18 seconds calculated by the witness John E. Marriner, a marine architect.

Marriner testified the barge could carry 2000 tons of rock if the center of the load did not exceed nine to 10 feet above the deck.

There is likewise conflicting evidence as to whether the bare steel deck was suitable for hauling rock.

■ Weighing all of this evidence, the court finds it does not establish unseaworthiness of the barge nor negligence on the part of American.

The court then turns to the question whether there was fault on the part of the Garvin firm.

Captain Garvin testified to events leading up to the casualty:

The voyage had proceeded uneventfully until tug and tow reached a point approximately two miles from the job site. The sea was calm, with long swells estimated at five to six feet. There was a wind of three to four miles an hour. The barge was rolling about five degrees.

The GARVIN began to shorten its tow line. The barge sheered sharply into the trough of the sea (i. e., parallel to the swell), and rolled about 30 degrees to starboard. The cargo shifted. Captain Garvin radioed for aid, and headed the barge into the sea. Despite efforts to

save the load—which need not be set out in detail—the barge listed still farther, and most of the cargo slid into the water. Relieved of the load, the vessel righted itself.

There is some evidence the casualty may have resulted from synchronization: that is, the roll of the ship, which is determined by its construction and load, may have come into synchronization with the rhythm of the waves.

Various witnesses testified when this phenomenon occurs, even in a calm sea, the roll of the vessel is sharply increased within a few seconds, and the vessel may be lost.

There is no direct evidence to establish this phenomenon as the cause of the accident. The witness Domac said such oscillation "might have happened" but he did not believe it in fact occurred. The witness Marriner, too, testified synchronization "may" have caused the casualty.

Viewing as a whole the evidence as to the third-party respondent Garvin, the court finds the casualty resulted despite seaworthiness of the tug and due care on the part of Garvin.

Finding no fault established on the part of any of the parties, the court can only echo the words of the witness Marriner, that the casualty was "one of those unfortunate things that can happen in the best of families." Cf. Maroceano Compania Nav. S.A. of Panama v. City of Los Angeles, 193 F.Supp. 529 (S.D. Cal.1961); Walston v. Lambertsen, supra. The casualty remains an unexplained accident of the sea.

█ Damage to the barge must be borne by American. Loss of cargo is to be borne by Healy Tibbitts, which had title to the rock at the time of the casualty. Remaining damages sought by Healy Tibbitts are denied.

Counsel for third-party respondent Garvin shall prepare findings of fact, conclusions of law, and judgment in accordance herewith.