**NEUBROS CORPORATION et al.,**
**Plaintiffs,**

v.

**NORTHWESTERN NATIONAL INSUR-
ANCE COMPANY et al., Defendants.**

No. 70–C–596.

United States District Court,
E. D. New York.

Oct. 17, 1972.

On Motion to Amend Dec. 28, 1972.

Burlingham, Underwood, Wright, White & Lord, New York City, for plaintiffs.

Kirlin, Campbell & Keating, New York City, for Levon Properties Corp.

McHugh, Heckman, Smith & Leonard, New York City, for Northwestern National Ins. Co., The Travelers Indemnity Co. and United States Fire Ins. Co.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

On September 3, 1968, the deck of steel sand-barge SEL–1 fractured during a fill loading operation conducted by the defendant Levon Properties Corporation (Levon). Levon constructed a dock at Jamespont, Long Island, and installed equipment for loading barges with fill which were towed across Long Island Sound to ports in Connecticut. Levon was a bareboat charterer under a charter-party dated June 19, 1968 with plaintiffs, South and Eastern Barge Leasing Company (plaintiffs).[1] The fracture resulted in a constructive total loss of the barge. The action is brought against the Hull Underwriters (Underwriters) and Levon for a constructive total loss of the barge in the sum of $75,000.

On April 26, 1968 the plaintiffs entered into a charter-party with Levon for the bareboat charter of fifteen (15) steel barges to be constructed by plaintiffs.[2] It provided for the delivery

1. South and Eastern Barge Company was the name assumed in the joint venture to conduct the business of leasing barges by Neubros Corporation, East Coast Barges, Inc. and Southeastern Brokerage Corporation.

2. The barges were to be built in Green Cove Springs, Florida, and in Kearney,

of two (2) barges in April 1968, and three (3) each month thereafter. It further provided for the execution of a bareboat charter-party in the form annexed for each barge at the time of delivery. Levon had asked for a representation that these Newbuildings would be able to carry 1200 long tons on a draft of 10½'.[3] Plaintiffs were unwilling to make that representation. A supplement to the charter-party gave Levon the option of terminating the agreement and refusing all undelivered barges within seven days after delivery of the first barge if upon a survey to be conducted by Edward F. Ganly it was found that the barge was not capable of carrying "approximately 1200 long tons of cargo at a draft of 10½'."

At the time the charter-party was executed, i. e., April 26, 1968, two barges were in construction. The charter-party provided for delivery in April 1968. Delivery of the first two barges was delayed until June 15, 1968. On that date barges SEL–7 and SEL–8 were delivered to Levon. The charter-party provided for a term of five years at a charter hire of $1,050 per month.

Levon required additional barges in June 1968. On June 19, 1968 it entered into a bareboat charter-party with plaintiffs for a steel deck barge that was then lying in Kearney, New Jersey—the SEL–1.[4] The SEL–1 was larger than the Newbuildings. It was 150' in length, 40' beam, and 12' in depth. It was built by Duval Shipyards of Green Cove Springs, Florida, from parts of scrapped liberty ships in April 1967. The SEL–1 was built to plaintiffs' plans and specifications and under plaintiffs' supervision.[5] On September 1, 1967 it transported two cranes from Green Cove Springs, Florida to Jersey City, New Jersey. Thereafter she was berthed at Kearney, New Jersey, until chartered to Levon. The SEL–1 was towed to Reynolds Shipyard for certain repairs. The bareboat charter-party for the SEL–1 provided for a term commencing with the date of completion of the "on hire" survey until December 15, 1970 at a hire of $1,200 per month. The "on hire" survey was made by United States Salvage Association in accordance with the charter-party. It was completed on June 20, 1968. The barge was delivered to Levon on June 24, 1968. The barge's intended use was fully described,[6] in the charter-party, which also required

New Jersey. The charter party provided that the barges were to be constructed " . . . out of steel plates and shapes from liberty ships . . ." in accordance with plans identified as plan number 1968–2 and 1968–3 both dated April 5, 1968. The plans showed the dimensions to be 130' in length, 40' beam and 12' depth with a cargo box on top. It further provided "as noted in the said plans, workmanship, materials, welding, and scantlings are to be in accordance with the Rules of the American Bureau of Shipping for service on Rivers, Harbors, and Intracoastal Waterways, except such barges need not be classified."

3. Testimony of John Neu (tr. p. 42).

4. In July 1968 the parties entered into a charter-party for a sister barge built about the same time at Duval Shipyards, Green Cove Springs, Florida, named the SEL–2.

5. Testimony of John Neu (tr. p. 64).

6. 5. *Use and Trade of the Vessel.* (a) The Charterer intends to use the aforesaid Vessel for the transportation of sand, gravel and fill, including bank-run of such commodities which may be loaded to the Vessel by customary means including but not limited to, conveyor belts, grabs, front end loaders and/or buckets. Discharge of the aforesaid commodities may be made in accordance with the custom of the trade including, but not limited to, the use of clam shells.

(b) The Charterer intends to use the aforesaid Vessel in its trade, under tow by an independent tower, manned or unmanned, in greater New York Harbor, including, but not limited to the adjacent rivers, harbors, sounds, tributaries and adjacent ports of Long Island, Connecticut, Block Island Sound, Buzzards Bay, the Cape Cod Canal and Cape Cod Bay. Owner is not responsible for meeting requirements of any load lines or I.C.C. regulations.

Levon to insure against damage to the hull in an amount not less than $75,000.[7]

On May 13, 1968 Underwriters issued a marine policy # 68H101 insuring barges owned and/or operated by Levon as listed in a schedule [8] attached to the policy against marine risks including among others, negligence of charterers and accidents in loading, discharging or handling cargo. The policy contained an Inchmaree clause providing coverage for damage caused by,

7. 9. *Insurance.* (a) During the period of the Charter party the Charterer will, at its own expense, insure and keep the Vessel insured under policies fully covering marine and war risks on hull and covering Owner and Charterer with protection and indemnity insurance or coverage equivalent to that normally insured under marine protection and indemnity policies, including coverage for property damage and claims arising under the Longshoremen's and Harbor Workers' Compensation Act and the Jones Act. The Owner and Charterer shall be included as named assured in all insurance.

The Vessel shall be covered with hull insurance in an insured amount not less than $75,000 with a deductible or franchise not exceeding $1500; and the protection and indemnity insurance shall be maintained in an amount not less than $1,500,000 with a deductible or franchise not exceeding $1,500.

8.

### SCHEDULE OF VESSELS

| VESSEL | VALUE & AMOUNT INSURED ON HULL, MACHINERY, ETC. | AMOUNT INSURED ON PROTECTION & INDEMNITY |
|---|---|---|
| Steel Barge "R.S.–11" | $50,000 | $50,000 |
| " " "R.S.–12" | " | " |
| " " "R.S.–13" | " | " |
| " " "R.S.–14" | " | " |
| " " "R.S.–15" | " | " |
| Newbuilding Steel Barge 1 (delivery expected late April 1968) | $75,000 | $75,000 |
| Newbuilding Steel Barge 2 (delivery expected late April 1968) | " | " |
| Newbuilding Steel Barge 3 (delivery expected late May 1968) | " | " |
| Newbuilding Steel Barge 4 (delivery expected late May 1968) | " | " |
| Newbuilding Steel Barge 5 (delivery expected late June 1968) | " | " |
| Newbuilding Steel Barge 6 (delivery expected late June 1968) | " | " |
| Newbuilding Steel Barge 7 (delivery expected late July 1968) | " | " |
| Newbuilding Steel Barge 8 (delivery expected late July 1968) | " | " |
| Newbuilding Steel Barge 9 (delivery expected late Aug. 1968) | " | " |
| Newbuilding Steel Barge 10 (delivery expected late Aug. 1968) | " | " |
| Newbuilding Steel Barge 11 (delivery expected late Sept. 1968) | " | ". |
| Newbuilding Steel Barge 12 (delivery expected late Sept. 1968) | " | " |
| Newbuilding Steel Barge 13 (delivery expected late Oct. 1968) | " | " |
| Newbuilding Steel Barge 14 (delivery expected late Oct. 1968) | " | " |
| Newbuilding Steel Barge 15 (delivery expected late Nov. 1968) | " | " |

". . . any latent defect in the . . . hull (excluding the cost and expense of replacing or repairing the defective part)."

Levon notified Underwriters of the delivery of the SEL–1. Underwriters mistakenly believed that the SEL–1 was a Newbuilding. Since this was the third barge delivered by plaintiffs to Levon (SEL–7 and SEL–8 having recently been delivered) Underwriter issued its endorsement extending policy # 68–H–101 "to Newbuilding steel barge 3" on June 26, 1968.[9] After Levon advised Underwriters of the error in description a further endorsement was issued dated July 12, 1968 stating:

"Referring to endorsement dated June 26, 1968, the 'SEL–1' is not Newbuilding Steel Barge 3."

Underwriters has failed to sustain its claim that Levon concealed the fact that the SEL–1 was not a Newbuilding.

The frame of the SEL–1 was made from scrapped parts of World War II Liberty ships. Since the component parts were not fabricated in accordance with plans but rather the other way around in that the available parts were sorted out to match the plan, the precise size was not always used. The side frames were spaced 30 inches apart and designed to support the deck beams running from port to starboard which were also spaced 30 inches apart; but the deck beams did not always meet the side frames. The hatch beams of the Liberty ship were used on the SEL–1 as longitudinals which supported the deck beams, the longitudinals in turn were supported by stanchions. Two stanchions supported each longitudinal in each of the four compartments. There were three longitudinals in each compartment. The longitudinals were not in alignment with those of the other compartments. The compartments were 27 feet 6 inches wide. The stanchions were set 9 feet 2 inches apart. The stanchion's outer diameter measured four inches. Where the various parts of the frame were joined by welding, the welding did not penetrate and was defective. The stanchions had single brazing fore and aft. They did not have X bracing or buck bracing.

The SEL–1 carried fill from Levon's dock at Jamesport across the Long Island Sound to Connecticut on six occasions. The largest load was on July 10, 1968 when it carried 1,079 cubic yards or approximately 1,276 long tons.[10] On August 31 and September 1, 1968, fill from along the inner side of the loading berth was placed on the SEL–1.[11] Approximately 350 cubic yards had been dredged up from alongside the loading berth by crane and clamshell bucket. Excess water ran off leaving a minimum amount of water in the fill. On September 3, 1968, dry fill was added to the load from the shore loading facility. The loading equipment consisted of a conveyor in a fixed position extending 20' from the pier side. The fill was distributed by moving the barge by means of cables attached to winches that moved the barge fore and aft. On September 3, 1968, the dry land fill packed to a height of not more than nine feet above the deck along the fore and after center line. During the loading operation the

9. Underwriters' confusion is evident in the issuance of the endorsement covering the SEL-7 and SEL-8 on June 21, 1968. It read:
"Newbuilding Steel Barge 1 and Newbuilding Steel Barge 2, were delivered to the assured and renamed SEL-7 and SEL-8 on June 15, 1968, 12:01 Eastern Daylight Time."

10. Stipulation of facts:
"Y. The fill cargoes carried by SEL barges averaged between 2,600 to 2,700 pounds per cubic yard."

11. The loading berth varied from 8 to 16 feet at low and high tide. Because of the spillage of fill in the loading operation and washing of fill from the land bank into the berth, the berth shoaled. This caused frequent grounding of barges at the loading berth. The recovery of this fill was necessary for the continued use of the berth and such fill was transported and sold at ports in Connecticut.

internals buckled and the deck fractured causing a total constructive loss. The deck fractured eight feet aft of the bulkhead.[12] The fracture was caused by the collapse of the frame supporting the deck upon placement of the additional dry fill at that site. Though the deck plates on the SEL–1 were thicker than plates normally used, the weld was defective. The fracture split the deck athwartship causing a breach in the deck of about 2½ feet. The derangement of the members of the vessel's frame at the time of the loading on September 3, 1968 caused the fracture.

## The Warranty of Seaworthiness to the Charterer

The general rule is that every charter implies a warranty by the owner that the vessel is seaworthy unless the parties agree to the contrary. The Caledonia, 157 U.S. 124, 131, 15 S.Ct. 537, 540, 39 L.Ed. 644 (1895); McAllister Lighterage Line, Inc. v. Insurance Co. of North America, 244 F.2d 867, 871 (2d Cir. 1957); Jordan, Inc. v. Mayronne Drilling Service, 214 F.2d 410 (5th Cir. 1954), Gilmore and Black, The Law of Admiralty, p. 182. Knowledge by the charterer of an unseaworthy condition will not deny him the right to rely on the owner's implied warranty of seaworthiness. Church Cooperage Co. v. Pinkney, 170 F. 266 (2d Cir. 1909), cert. denied, 214 U.S. 526, 29 S.Ct. 704, 53 L.Ed. 1068. Agreements relieving the owner of obligation under the implied warranty of seaworthiness are not favored. The Carib Prince, 170 U.S. 655, 659, 18 S.Ct. 753, 755, 42 L.Ed. 1181 (1898). In the *Carib Prince* the Court said:

" . . . clauses exempting the owner from the general obligation of furnishing a seaworthy vessel must be confined within strict limits, and were not to be extended by latitudinarian construction or forced implication so as to comprehend a state of unseaworthiness, whether patent or latent existing at the commencement of the voyage."

Plaintiffs' refusal to represent that the Newbuildings could sustain a load of 1200 long tons and the agreement giving the charterer the option of rejecting the undelivered Newbuildings if Ganly's survey found it did not have the capacity to carry 1200 long tons on a draft of 10½' is not a waiver by Levon of rights that accrued under the implied warranty.[13]

## The Warranty of Seaworthiness to the Insurance Carrier

Just as the warranty of seaworthiness is implied in every charter unless expressly waived, so it is implied in every hull policy of insurance unless expressly waived. McAllister Lighterage Line, Inc. v. Insurance Co. of North America, *supra*, 244 F.2d at p. 871. The argument that such warranty is implied in voyage hull policies but not in time hull policies is not supported by Ameri-

12. A second fracture 41 feet forward of the after-cargo bulkhead is attributed to a "hog" at the bottom of the hull. A hog is a distortion of the hull resulting from pressures it cannot withstand. When the pressure is applied to the bow and stern the center is pushed up from the bottom to the deck. When the pressure is applied to the midship of the vessel it causes a downward distortion to the deck and a sagging on the bottom at midship. The court finds that this distortion occurred after the loading incident on September 3, 1968, when the barge rested on a shoal amidship with bow and stern free, causing upward pressure amidships.

13. Par. 16 of the charter party provides: "Carrying Capability. The Charterer shall have no claim against the Owner for any deficiency in the carrying capability of the Vessel." The charter party dated April 26, 1968 gave Levon the right to survey the first barge built under that agreement. If the barge was not capable of carrying 1200 long tons (2,240 pounds per ton) on a draft of 10½ Levon had the right to cancel the agreement as to any barges not then delivered. This clause did not affect the charter party for the SEL–1.

can case law. It is well established that the warranty of seaworthiness attaches to a time hull policy at the time the policy becomes effective. Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715; Tropical Marine v. Birmingham Fire Ins. Co., 247 F.2d 116, 119 (5th Cir. 1957), cert. denied, 355 U.S. 903, 78 S. Ct. 331, 2 L.Ed.2d 260.

> "[T]he undertaking as to seaworthiness of the shipowner to the shipper is coextensive with that of the shipper to his insurer." The Caledonia, *supra,* 157 U.S. at p. 131, 15 S.Ct. at p. 540.[14]

### Seaworthiness

■ Seaworthiness is a relative term. "[I]t expresses a relation between the state of the ship and the perils it has to meet in the situation it is in." 2 Arnould, Marine Insurance (14th Ed.), p. 630. It is the fitness in design, structure and condition to perform the task for which the vessel is chartered. The Caledonia, *supra,* 15 S.Ct. at p. 540; McAllister Lighterage Lines, Inc. v. Insurance Company of North America, *supra,* 244 F.2d at p. 870; 1 Carver, Carriage by Sea (12th Ed.), p. 98.

The parties to the charter party agreed that the intended use of the SEL–1 was to carry fill, loaded at Port Jefferson, across the Long Island Sound to Connecticut. Plaintiffs also knew that Levon intended to load the Newbuildings with 1200 long tons each. The Newbuildings were smaller barges. It may fairly be inferred that at the time of the SEL–1 charter, plaintiffs were aware that the probable loads on the SEL–1 would exceed 1200 long tons. This is evidenced by the awareness of the parties to the charter party of possible unseaworthiness of the smaller Newbuildings in their cargo-carrying capacity, as shown by the limited right given

Levon to terminate the agreement and refuse delivery of all the undelivered Newbuildings upon a surveyor's finding that the 1200 long ton capacity was absent.[15] The experts substantially agreed that steel sand-barges in this area were expected to withstand pressure on their decks of 1200 pounds per square foot. There was expert testimony that a prudent consideration in determining capacity is a safety factor which would enable the vessel to withstand a load in excess of 1200 pounds per square foot.[16] The parties in the trade are aware that precise measurements are not taken at loading. The load is measured and weighed by the eye—not by surveyor's transit or chemist's scale.

Plaintiffs claim that Levon's method of loading caused the collapse. In loading, the peak of the load ran along the fore-and-aft line of the vessel causing some inequality in the weight-distribution of the load. Though better methods of loading were available, the manner in which Levon loaded the barge did not constitute negligence in the loading. Assuming, however, that such method was negligent, it was not the proximate cause of the collapse.

■ The answer to the plaintiffs' argument is found in its brief. (Plaintiffs' post-trial brief, p. 12.) Plaintiff argues that the deck was subjected to the *"average* pressure of 1030 to 1190 pounds per square foot," where the load peaked to 10.3 to 11.9 feet above the deck. Plaintiffs further argue that a normally distributed load would subject the center-line of the deck to between 700 and 900 pounds per square foot and that the collapse might not have occurred if the load were so distributed. That is not the issue. The warranty of seaworthiness included a warranty that the carrying capacity of the SEL–1 was

---

14. English case law and statutory law is to the contrary. Rosa v. Ins. Co. of Pa., 296 F.Supp. 167 (S.D.Cal.), English Maritime Insurance Act of 1906 § 39(5).

15. The right to cancel was no longer available at the time of the SEL–1 charter.

16. Edward J. Ganly expressed the opinion that when the safety factor is introduced the deck should be able to withstand 2400 pounds per sq. ft. (tr. 191)

not less than 1200 long tons and that the per square foot load that the deck could withstand was 1200 pounds. The heaviest load carried on the barge was 1276 long tons (July 10, 1968). Plaintiffs' estimate of the greatest height of the load at any one point, 11.9 feet, indicates that the weight of the load never exceeded 1200 pounds per square foot at the fore-and-aft center line. The court is unable to draw the inference of seaworthiness from the six loads carried prior to September, 1968. No facts have been established from which the inference of seaworthiness may fairly be drawn. Only once, i. e. on July 10, 1968 was the warranty tested.

Levon and Underwriter have sustained the burden of proving that the SEL–1 was unseaworthy on June 19, 1968, at the time of the charter.

### The Inchmaree Clause

Plaintiffs and Levon claim that to the extent that the loss resulted from latent in-the-hull defects, the Inchmaree clause modified or waived the warranty of seaworthiness. Saskatchewan Government Insurance Office v. Spot Pack, 242 F.2d 385, 392 (5th Cir. 1957). The Inchmaree clause extends coverage to any loss of damage caused by a " . . . latent defect in the . . . hull . . . provided such loss or damage has not resulted from want of due diligence of the Assured."

The clause covers ordinary perils " . . . in cases where the damage cannot be said to be the direct consequence of a marine peril." 2 Arnould on Marine Insurance, § 861a, p. 782. Tropical Marine v. Birmingham Fire Ins. Co., *supra*. The coverage is not an agreement to pay the cost of repairing the latent defect. Ferrante v. Detroit Fire and Marine Insurance Co., 125 F. Supp. 621, 624 (S.D.Cal.1954); 2 Arnould on Marine Insurance § 861a, p. 783.

The Inchmaree clause does not insure against patent, apparent defects. The SEL–1 was built pursuant to plans drawn under plaintiffs' direction. Bertram Kessler, a naval architect (unlicensed) in plaintiffs' employ, examined the barge with Lewis R. Chapman in the Reynolds Shipyard in June 1968 at plaintiffs' request. He made a cursory inspection of the hold. He advised plaintiffs that the barge was unfit to carry a full load. He advised plaintiffs it could go into service " . . . on an emergency basis, only carrying a very limited amount of tonnage. I said I wouldn't exceed 500 tons on it." [17] The other experts were unanimous in their opinion that the barge was poorly constructed. Mr. Kessler testified that "[i]t was the worst piece of floating equipment I have ever seen in my life." [18] Mr. Chapman noted in his field survey report of the on hire survey that " . . . workmanship and welding are of substandard quality." Six experts were called by the parties. None testified that the SEL–1 was capable of carrying 1200 long tons of fill and/or the deck capable of withstanding a weight of 1200 pounds per square foot.[19]

Plaintiffs were aware of the unseaworthiness of the SEL–1. The claim that the defects were latent is specious. Plaintiffs had an affirmative duty to reveal such information to Underwriters. Their failure to do so vitiated the policy. Gulfstream Cargo, Limited v. Reliance Insurance Co., 409 F.2d 974, 980 (5th Cir. 1969).

The complaint is dismissed. The Clerk is directed to enter judgment in favor of the defendants and against plaintiffs dismissing the complaint.

17. Tr. pp. 577–578.

18. Tr. p. 579.

19. Richard J. Louis, a marine surveyor was called by plaintiffs. Edward J. Ganly, a marine surveyor and naval architect was called by Levon. L. R. Chapman, a draftsman and former superintendent of hull construction at Federal Shipbuilding at Kearney, Richard A. Cady, a marine surveyor, Donald R. Hudson, a naval architect and Bertram Kessler were called by Underwriters.

**318**

## ON MOTION TO AMEND

Plaintiffs move to amend the memorandum of decision made and entered October 17, 1972, or alternatively for a new trial.

The court found (p. 315) that Levon did not waive the implied warranty of seaworthiness because of the plaintiffs' refusal to represent that the Newbuildings could sustain a load of 1200 long tons and their grant to the charterer of the option of cancelling future deliveries as provided in the charter-party dated April 26, 1968. The plaintiffs' brief argues that paragraph 2 of the SEL–1 charter-party dated June 1, 1968, constituted a waiver of the implied warranty of seaworthiness. The clause states in part:

> "Delivery of the Vessel shall be made by the Owner 'as is' at the Port of New York immediately upon completion of the 'on hire' survey as provided in Clause 4 hereof."

The plaintiffs cite United States v. Agnew, 423 F.2d 513 (9th Cir. 1970) and Varkell v. United States, 334 F.2d 653, 167 Ct.Cl. 522 (1964). In *Agnew,* the government's description of the property "as is" was amplified by a highly specific express disclaimer:

> "The prospective bidders . . . were also advised that unless otherwise specifically provided, all property listed was offered for sale 'as is' and 'where is,' and that the Government made no warranty, express or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property or its fitness for any use or purpose." United States v. Agnew, 423 F.2d 513, 514.

The waiver clause in *Varkell* likewise specifically referred to warranties in the following language:

> " . . . Furthermore, the contractual article on 'Condition of Property'

provided that in this 'as is' sale 'the Government makes no guaranty, warranty, representation, expressed or implied, as to quantity, kind, character, quality, weight, size or description of any of the property, or the fitness for any use or purpose,' and that no claim would be considered if it was 'based upon failure of the property to correspond with the standard expected.' " Varkell v. United States, 334 F.2d 653, 655.

These cases are not on point. The clause in the charter-party did not contain any express disclaimer comparable to those in *Agnew* and *Varkell.*

Plaintiffs also cite McAllister Lighterage Line v. Insurance Co., 244 F.2d 867 (2d Cir., 1957) and Section 2–316(3)(a) of the New York Uniform Commercial Code, McKinney's Consol. Laws, c. 38. The court held in *McAllister* that the waiver must be in "plain and unequivocal" terms. The waiver which satisfied this standard made direct reference to the warranty in the following language:

> "The acceptance of said scow by charterer is to be conclusive evidence of the seaworthy condition of said scow at the commencement of this charter."

In Thomas Jordan, Inc. v. Mayronne Drilling Service, 214 F.2d 410 (5th Cir., 1954), the court held that the waiver must be "clear and unequivocal" and the following clause was found to be ineffective as a waiver:

> " . . . the charterer has had the barge inspected and found same to be in first-class condition . . ." 214 F.2d p. 412.

The "as is" phrase is at best ambiguous. A reading of the entire contract indicates that it was intended to limit the owner's share of the expenses of adapting the barge to the intended use to be made by the charterer.[1]

---

1. Clause 3 provided that the charterer was to pay 50% of the cost of certain modifications to the barge. Clause 7 provided that the charterer had the right to install additional equipment at its own cost and expense.

■ Reference to section 2–316(3)(a) does not help the plaintiffs. The section provides:

"Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."

For the purposes of the Uniform Commercial Code a bareboat charter for a period of eighteen months is not a sale as defined in sections 2–102, 2–105(1) and 2–106(1) of the Code.[2] This is not the kind of lease which has been held to come within the Code as "analogous" to a sale. Cf. Hertz Com'l Leas. Corp. v. Transportation Cr.Cl.H., 59 Misc.2d 226, 298 N.Y.S.2d 392 (Civil Court of the City of New York, 1969), where a lease was held in effect to be a sale. See also Under the Spreading Analogy of Article Two of the Uniform Commercial Code, 39 Fordham L.R. 447 (1971) and Note, U.C.C.—Disclaimer Clause of Implied Warranty Extended to Leases Analogous to Sale, 23 Southwestern L.R. 596 (1969). The SEL–1 was to be returned to its owners long before extinguishment of its market or use value. The charter was for a period of 18 months; the normal lifetime of a properly constructed sand barge is some 25 to 30 years (tr. pp. 325–26). Moreover, it is clear that Levon took the SEL–1 to provide a temporary replacement for the carrying capacity of the Newbuildings, whose delivery schedule had been delayed for several months.

■ The plaintiffs' argument fails to recognize the nature of the claim it makes on the theory of waiver. For, assuming waiver of the implied warranty of seaworthiness, the absence of such a warranty in favor of the charterer would not give the owner a right of action against the charterer. Such waiver, if found, did not impose an additional obligation upon the charterer.

■ Paragraph 13 of the charter party requires that the charterer redeliver the vessel on the expiration or earlier termination of the charter to the Owner and "The Vessel shall, upon such redelivery, be in the same order and condition as upon delivery, except ordinary wear and tear." The waiver assumed for the purpose of this discussion in no way modified paragraph 13. In Hudson Valley Light. AG. Corp. v. Windsor Bldg. & Sup. Co., 446 F.2d 750 (2d Cir. 1971), a steel deck barge under an oral demise charter capsized and sank while in tow. The court held that the owner makes out a prima facie case of negligence against the charterer when it shows that the barge was delivered in good condition and that it was returned damaged. It is then incumbent upon the charterer to go forward with evidence to show "(1) how the accident occurred and that this was not due to its negligence; or (2) that it exercised due care in its handling of the barge so that, no matter how the accident happened, it was not because of its negligence." (P. 751). The same agreement that was implied in Hudson Valley Light. AG. Corp. v. Windsor Bldg. & Sup. Co.[3] was expressed in the written charter party.

2. Section 2–102, defining the scope of the Article on Sales, states that "Unless the context otherwise requires, this Article applies to transactions in goods." "Goods" are defined in § 2–105(1) as "all things . . . which are movable at the time of identification to the contract for sale . . ." Section 2–106(1) defines "sale" as follows: "A 'sale' consists in the passing of title from the seller to the buyer for a price." A bareboat charter is "tantamount to, though just short of, an outright transfer of ownership." Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962); Gilmore and Black, The Law of Admiralty, § 4–20. Cf. Bergan v. International Freighting Corp., 254 F.2d 331 (2d Cir. 1958).

3. See Gilmore & Black, The Law of Admiralty § 4–22: [Under a demise charter] "the charterer's obligations are to redeliver the vessel in as good condition, ordinary wear and tear excepted as that in which he received her."

320

The charterer does not by reason of the agreement in paragraph 13 become an insurer. Liability is imposed unless " . . . the charterer can. show the damage resulted despite due care on its part . . ." American Cement Corp. v. Healy Tibbitts Construction Co., 249 F.Supp. 891, 892 (S.D.Cal.1966); Hudson Valley Light. AG. Corp. v. Windsor Bldg. & Sup. Co., *supra.*

The plaintiffs also challenge the court's finding that the plaintiffs failed to prove that Levon was negligent in the method of loading the SEL–1 and the further finding that even if Levon's method of loading was negligent, plaintiffs failed to prove that such negligence proximately caused the damage. The claim is spurious, the findings are sufficiently discussed in the memorandum of decision and further discussion here would serve no purpose.

The findings of fact in the memorandum of decision filed clearly indicate that Levon has sustained its burden of proving how the accident occurred and that it exercised due care and the accident occurred despite its due care.

The motion is in all respects denied, and it is

So ordered.