**SELCAMERICA, INC., et al., Plaintiffs,**

**v.**

**S. S. BARBERBROOK, her engines, boilers, etc., et al., Defendants.**

No. 74 Civ. 2947 (MP).

United States District Court,
S. D. New York.

Jan. 10, 1975.

As Amended Jan. 17, 1975.

11. The court finds no basis for an award of nominal compensation or punitive damages.

Cichanowicz & Callan, New York City, for defendant (Helecho), by Donald B. Allen, and Michael Carcich, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant (Barber Lines), by M. E. DeOrchis, and Chester Hooper, New York City, of counsel.

POLLACK, District Judge.

This is a dispute between the time charterer and the owner of the S. S. BARBERBROOK as to liability for damage to a cargo of coffee caused when water entered the hold where the coffee was stowed. The time charterer and the owner, the defendants in this action, concede liability to the cargo owners and have filed cross claims for indemnity against each other. Assignment of liability depends upon interpretation and application of the terms of the charter party, binding the two co-defendants, to the facts as found by the Court.

The following facts have been largely stipulated by the parties and those not stipulated have been found by the Court.

Plaintiffs are the owners of various shipments of bagged coffee carried from Douala, in Africa, to New York and Norfolk on the S. S. BARBERBROOK in June 1974. All or part of these shipments were damaged as a result of contact with salt water during the voyage, and plaintiffs are concededly entitled to recover from either or both defendants the total damages of $435,000. This sum is inclusive of all court costs and all interest to January 31, 1975.

The vessel was owned by defendant Helecho Shipping Corporation and at all relevant times was under time charter to defendant Barber Steamship Lines, Inc., which issued bills of lading and collected the freight. The governing contract between the defendant owner and charterer is the charter party dated January 19, 1973. Barber Lines was actually a sub-charterer, but it has been stipulated that it· is bound by the charter party in the place of A/S Garronne-Glittre, the actual signatory.

The S. S. BARBERBROOK is a general cargo ship, classed by Norske Veritas, and has four cargo holds. No. 4 hold contains an upper and lower tween deck as well as a lower hold. Directly beneath the lower hold are two deep tanks, sometimes referred to as the No. 5 deep tanks, one on the port side and one on the starboard side. Each deep

tank has two vent lines which terminate above the main deck, and a manhole opening into No. 4 lower hold located near the forward bulkhead. Each manhole has a steel coaming which extends several inches above the deck, and which has a hinged steel cover. The steel cover is constructed so as to be secured by eye-bolts attached to the coaming with wing nuts at the threaded end which tighten up against dogs affixed to the cover plate.

The ship's eastward voyage began with a stop in Philadelphia on April 18–20, during which time the hold was cleared of cargo and inspected by the Chief Officer and Bosun. The ship subsequently made stops at Baltimore and New York. It then proceeded to Africa where it stopped in succession at Freetown, Monrovia, Abidjan, Tema, Lagos/Apapa, Warri, Sapele, and Douala. At Douala on June 8–13 the coffee subject to this litigation was loaded in No. 4 lower hold. On June 16, at sea, the ship ballasted the deep tanks beneath No. 4 lower hold, and on June 17 at 6 A.M. water was discovered in No. 4 lower hold. The ship proceeded to Freetown and then returned to North America, discharging the coffee at New York and Norfolk.

Prior to any loading in Philadelphia, both the Chief Officer and the Bosun inspected the manhole covers to the deep tanks and found them properly and tightly secured. At Philadelphia, drums of lube oil were hand stowed on plywood dunnage in the forward end of No. 4 lower hold, covering the manhole covers to the deep tanks.

At all relevant times charterer had on board a super-cargo whose job included expediting the loading and discharging of cargo. At New York, charterer placed on board two forklift trucks which were to be used in moving cargo. Upon arrival at Freetown, the vessel embarked sixteen "Krooboys", who remained on board until the ship returned to Freetown on June 17. Owner and charterer each paid for eight Krooboys. Two Krooboys were designated as fork-lift operators. The Chief Officer testified that he thought the Krooboys were erratic in their operation of the machines. Forklift trucks were not used to load the coffee subject to this suit in Douala.

On the voyage in question, the only use of the No. 5 port and starboard deep tanks was to adjust the trim and stability of the ship by ballasting or deballasting as the need arose. Shortly after leaving on the outward voyage, the No. 5 deep tanks were fully ballasted. The vessel's customary method was used for fully ballasting these tanks, i. e., water pumped into them until they overflowed from the vent pipes on the main deck. This operation normally takes approximately four hours.

Prior to entering Warri, draft restrictions required deballasting of the No. 5 deep tanks. After departure from Douala, where the coffee was loaded, the order was given to ballast both deep tanks. The pumping started at 6 P.M. No soundings were taken as the tanks were being filled and the pumping was continued for about six hours, although only four were usual. The pumping was discontinued when water was observed coming from the port side deck vent. No water was observed coming from the starboard vent. Soundings taken the following morning disclosed that No. 4 lower hold was flooded to a depth of about 3 meters. The water was drained off and the ship continued to New York where a portion of the cargo in No. 4 lower hold was discharged. The ship then proceeded to Norfolk, where the remainder of the cargo in No. 4 lower hold was discharged.

Surveyors representing all parties made a joint inspection at Norfolk and observed the conditions of No. 4 lower hold. At Norfolk, the port manhole cover was tested and found to be tight. The manhole cover on the starboard side was partially open, and unquestionably this was the sole source of the water that came up into the hold from the deep tank below.

As noted above, the manhole cover was designed to be secured by eight assemblages, consisting of "dogs", or bolts, which passed through pads affixed to the cover plate and were tightened down by wing nuts. At the time of the inspection and survey at Norfolk, of the eight assemblages, the three on the forward edge of the square manhole cover were in proper condition. In two other assemblages, one on the inboard, the other on the outboard side of the manhole cover, the wing nut was missing. On the aft side of the cover, in the assemblage in the inboard corner, the pad was broken off, and in the other two assemblages, the dogs were broken or bent. It was the condition of these fastening devices that made the manhole cover non-watertight.

Shipowner presented expert testimony by a metallurgical engineer that the damage to the three aft assemblages *could* have been done by a heavy blow from a steel object such as a forklift blade. The expert admitted, however, that the cause of the damaged condition was entirely speculative and that the damage could have resulted from other undescribed causes as well.

It is the customary and proper practice for ship's officers or their delegates to inspect a hold prior to the loading of cargo at any port, and in that inspection reasonable care and attention require the check of a manhole cover such as the one here in question for possible damage or insufficiency of the securing devices to make the cover watertight. Should damage or insufficiency of the fastenings be found, the ship's officers would then see that it was repaired or corrected. The presence of plywood dunnage scattered on the floor of a hold is not considered in the trade to be an excuse for forgoing such an inspection. The inspecting seaman is expected in the exercise of ordinary care and prudence to have any interfering dunnage cleared away so that the inspection can be properly conducted and completed. In this case, the Chief Mate was asked at deposition: "As a matter of course, would a mate inspect the hatches, the manhole covers and the rose boxes after discharging of all cargo from the hatch?" His answer was "Yes, he does." Although the hold in question was clear of cargo at the time the coffee was to be loaded, there was no evidence that such an inspection, either subsequent to unloading the cargo previously in No. 4 lower hold or prior to loading of the coffee there, did take place by any ship's officer.

The Chief Mate was also asked, "Do you know of anyone who made an inspection of the lower hold in number four after the hold had been completely discharged at Apapa?" He answered "I don't know". He identified the mate on watch at the number four hold when the discharge was completed at Apapa as one Moratoglou, the second mate. When asked "Did the second mate ever advise you that he had inspected the bottom of number four hold?" the Chief Mate answered "No." No deposition or other testimony of second mate Moratoglou was offered in evidence. The Bosun, Mr. Svinos, was asked "After discharge of the cargo . . . did you go down into the lower hold No. 4? . . . I am referring to the period that the vessel was in Monrovia and Apapa?" He answered: "I don't go down at all".

Similarly, there was no evidence that the No. 4 lower hold had been inspected prior to the loading of the coffee in Douala. The Bosun, who described his duties, in deposition, as *inter alia* "to check the holds" and who testified that he had in fact checked the holds prior to the vessel's departure from the American east coast, was asked: "As I understand it, at Douala, before the coffee was loaded at Douala, you didn't [examine the hatch cover and tighten the fastening bolts as he had done on the American east coast]?" The Bosun answered "Before it got loaded, I told you that they don't pay me to go down in the bottom of the hold and they have crew boys whose job it is to do that."

There is no evidence from which to draw a credible inference that the man-

hole cover was deliberately hidden from the ship's officers with a sheet of plywood dunnage to keep any ship's officer or delegate from inspecting the cover, its appurtenances and water-tightness. Nor is there any evidence that the manhole was covered by anyone with dunnage with the purpose to conceal its damaged and unseaworthy condition.

A duty of inspection cannot be said to have been frustrated if, as here was the case, no ship's officer or delegate looked, in order to see what was there; no one came to the hold; no one interfered with any officer of the vessel coming to and attempting to look at the manhole cover before the coffee was loaded. Clearing away the dunnage would not have eliminated the danger to the cargo from the unseaworthy condition of the manhole cover.

█ The only reasonable inference from the evidence in this record is that the charterers' people involved in loading, stowing and unloading cargo initially must have created the hazard. The evidence showed that the manhole cover, its fastenings and appurtenances were in good order and condition and watertight at the start of the voyages eastward. Contributing to the tortious act attributable to the charterer, the shipowner negligently failed to discover and correct the danger that had been created with the result that the vessel was unseaworthy. The ballasting operation brought the hazard to fruition—the coffee was destroyed. There can be no contention in this case that the damage to the manhole cover was done at the time of the loading of the coffee in Douala— slings were used in the loading process there. Nor could the damage have been done after the coffee had been loaded, as the cover was then buried under piles of bags of coffee. A proper inspection prior to loading of the coffee in question would thus have brought to light the absence of the missing fasteners, the damage to the other fasteners, and the insufficiency of the cover to keep water from coming up from the tank into the hold, and proper repair or correction of

the open condition at that time would have prevented the damage sued for herein.

The time charter which binds the charterer and the shipowner contains the following clauses of relevance to this dispute:

"4. The Owners to . . . maintain [the vessel] in a thoroughly efficient state in hull and machinery during service."

"5. . . . Whilst on hire the Charterers . . . to arrange and pay for loading, trimming, stowing . . . unloading . . . and all other charges and expenses whatsoever."

"12. . . . The Owners shall be liable for claims in respect of cargo arising or resulting from:

a) Failure on their part properly and carefully to carry, keep and care for the cargo while on board.

.     .     .     .     .     .     .

c) *Lack of due diligence on their part before and at the beginning of each voyage to make the Vessel seaworthy* but claims arising from the faulty preparation of the holds and/or tanks of the Vessel or from bad stowage of the cargo not affecting the trim or stability of the Vessel on sailing shall be the Charterers' liability. (Emphasis supplied)

Except as aforesaid the Charterers shall be liable for all cargo claims."

"13. . . . the responsibility for any loss, damage, delay or failure in performance of this Charter, not dealt with in Clause 12 . . . upon the owners to be subject to the following exceptions:

Any act or neglect by the Master, pilots or other servants of the Owners in the navigation or management of the Vessel . . . ."

Other clauses, pointed out by the parties, have been considered by the Court but do not have such relevance as to warrant inclusion here.

█ This Court holds that the ship's officers in this case should in the exercise of reasonable diligence to make the

ship seaworthy have inspected No. 4 lower hold to ascertain and correct the unseaworthy condition of the starboard manhole cover and caused dunnage to be cleared away if that was necessary to enable a reasonable inspection of that manhole and its cover, before cargo was loaded into that hold at the commencement of the vessel's voyage from Douala to the United States. The statutory mandate of 46 U.S.C. § 1303(1) is that "[t]he carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—(a) Make the ship seaworthy; . . ." Seaworthiness has been defined as "the fitness in design, structure and condition to perform the task for which the vessel is chartered." Neubros Corp. v. Northwestern National Insurance Co., 359 F. Supp. 310, 316 (E.D.N.Y.1972). The defects in the fastening devices on the starboard manhole cover in No. 4 lower hold made the vessel unseaworthy as to the cargo in question.

■ The fact that reasonable diligence required the ship's officers or their delegate to inspect the holds prior to the stowage of cargo does not mean that their misfeasance is automatically attributable to the shipowner. A ship's captain or his crew may be agents of the charterer if they are performing duties which are the responsibility of the charterer. *See, e. g.,* Nichimen Co. v. M. V. Farland, 462 F.2d 319, 333 (2d Cir. 1972).

The co-defendants here have allotted responsibility between themselves in a charter party, the relevant portions of which have been set out *supra.* The net effect of the seemingly overlapping liabilities of the owner set out in clauses 4 and 12(a) and of the charterer set out in clause 5 is that the shipowner is assigned general responsibility for the maintenance and operation of the ship, and the charterer is assigned general responsibility for the stowage and discharge of cargo. This general tenor of the agreement is helpful in the interpretation of clause 12(c), which deals with the obligation to use due diligence to provide a seaworthy vessel and upon which this case turns.

■ This Court holds that a reasonable inspection of the hold prior to the stowage of cargo, to the extent that that inspection was directed toward assuring the effectiveness of the manhole cover that was to keep water from entering the hold from the deep tanks below, was not "preparation of the holds" within the meaning of clause 12(c) of the charter party. Interpreted in light of charterer's general responsibility for cargo stowage, this clause is held to mean preparation for the safe stowage of cargo and not protection of the hold from damage from other parts of the ship. The failure to properly inspect here thus does not constitute faulty preparation of the holds so as to transfer liability for it to the charterer.

■ The charterer has the right to rely in his stowage operations on the owner's obligation to use due diligence to provide a seaworthy vessel. *Cf.* Church Cooperage Co. v. Pinkney, 170 F. 266 (2d Cir. 1909); Neubros Corporation v. Northeastern National Insurance Co., 359 F.Supp. 310 at 315 (E.D.N.Y. 1972). Were it otherwise, under terms such as are in this charter party, in any case in which the charterer puts goods aboard a ship that it "should have known" was unseaworthy, it would be liable. The shipowner's obligation to use due diligence to provide a seaworthy vessel would thus be illusory, since in the stowing operations the ship's officers are charterer's agents, who, in any case in which they have failed to use due diligence to make the vessel seaworthy, "should have known" that it was unseaworthy. The exceptions to owner's liability in clause 12(c) do not apply.

When two parties are substantially at fault in admiralty cases, the question of contribution has received different answers depending on whether the injuries are to person or property and whether the decision is made under law of the United States or other maritime jurisdiction. In the United States in proper-

ty damage suits the losses are equally divided. This tradition stems from the early decisions where an accurate assessment of relative culpability could not be made, and the failure of the United States to ratify the Brussels Convention. This treatment of collision damages is unique to the United States.[1]

There has been an unwillingness of the law as a matter of policy to make relative value judgments of degrees of culpability between wrongdoers.

■ However, there is no prohibition in personal injury maritime cases to division of damages on the basis of proportional fault. The personal injury cases apply comparative negligence, United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), as does the Death On The High Seas Act, 46 U.S.C. §§ 761, 766.

The equal division rule has been frequently criticized in this Circuit as inequitable. *See, e. g.,* Marine Fuel Transfer Corp. v. The Ruth, 231 F.2d 319, 321 (2d Cir. 1956), where it was referred to as a "well established but illogical rule", In re Adams' Petition, 237 F.2d 884, 887 (2d Cir. 1956), in which the Court commented upon the "inherent injustice" of the equal division rule, and Ahlgren v. Red Star Towing & Transport Co., 214 F.2d 618, 620–621 (2d Cir. 1954), in which it was noted that "virtually every country except ours has abandoned" the equal division rule. *See also,* Judge Learned Hand's dissent in Ulster Oil Transport Corp. v. The Matton No. 20, 210 F.2d 106, 110 (2d Cir. 1954) in which he objected to "our strange obstinacy in clinging to the division of damages and refusing to apportion them". He pointed out that: "This has become even more egregious, when we reflect that, where personal injuries are

in issue, we do follow the more enlightened doctrine, now in force in most countries." (footnote omitted).

A deterrent to finding comparative fault in the instant case is the policy consideration recently again expressed by the Court of Appeals "to abstain from attempting to change the law in areas such as this, preferring to leave doctrinal development to the Supreme Court or to await appropriate action by Congress." Reliable Transfer Co., Inc. v. United States of America, 497 F.2d 1036 at 1038 (2d Cir. 1974). The Second Circuit quoted with agreement the earlier statement of Judge Hincks in In re Adams' Petition, 237 F.2d 884, at 887 (2d Cir. 1956) that:

> [T]he rule of equal division of property damage is so well established in this country that it would create intolerable confusion were a court of intermediate jurisdiction such as ours to deviate from it. We shall therefore continue to apply the rule until there shall be authoritative sanction for departure therefrom.

*See* G. Gilmore and C. Black, The Law of Admiralty, Ch. VII at pp. 440–42, (1957).

However, the defendants have each invited the Court to make an equitable apportionment rather than a mechanical equal division in this case. This joint request in effect is a stipulation as to damages. The defendants herein contend that if there is a finding of joint fault then an apportionment of the damages should be made; each defendant argues that its culpability, if any, is minimal.

■ The intolerable confusion which has concerned the Courts that have been asked to forego the equal division rule would not seem to be a factor in situa-

---

1. The rule of equal division of damages (or moiety rule) in admiralty cases where two parties are found to be at fault has been traced to Lord Gifford's holding in a collision case in Hay v. Le Neve, 2 Shaw 395 (H.L.1824), *see* In re Adams' Petition, 125

F.Supp. 110, 113 (S.D.N.Y.1954), and its most ancient origins have been identified as Art. XIV of the twelfth century Laws of Orleons, *see* Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Calif.L.Rev. 305, 306 (1957).

tions where both parties have expressly opted for apportionment based on relative fault.

■ The quasi-stipulation of the parties herein on the question of damages leads to the following results.

The fault in this controversy is principally that of the shipowner, which was liable for the failure of the ship's personnel to use due diligence at the beginning of the voyage from Douala to provide a seaworthy vessel by properly inspecting the No. 4 lower hold. The liability of the shipowner for the damage is fixed and apportioned at 75% thereof which represents its degree of contributory fault.

The balance of 25% of the damage is fixed and apportioned as charterer's degree of contributory fault in the joint tortfeasance of the parties. The defendant Barber Lines by its own conduct or conduct for which it was responsible contributed to the total loss by the creation of the hazard through damage to the manhole cover which it or its agents caused or were responsible for causing.

Accordingly, Helecho's contribution on account of the stipulated amount to be paid to the plaintiffs by January 31, 1975 is in the sum of $326,250 and the defendant Barber's contribution shall be the sum of $108,750.

The defendants are jointly liable to the plaintiffs for $435.000. The defendant who satisfies the liability to the plaintiffs shall receive contribution from the non-paying defendant according to the apportionment of fault fixed and found hereinabove.

The foregoing constitute the findings of fact and conclusions of law of the Court as required by Fed.R.Civ.P. 52(a).

Judgment will be entered herein in accordance with the foregoing and defendants may submit a proposed decree for the Court's consideration.

So ordered.

### SUPPLEMENTAL AND AMENDED FINDINGS AND OPINION

Defendant Barber Lines has in effect moved for reargument of this Court's decision and opinion in this case. The motion is granted and the Court's original decision is adhered to. Two sentences of the opinion issued January 10, 1975, have, however, been amended in order to clear up the confusion that is evident in Barber Lines' motion.

As these amendments make more clear, the Court found that there was a duty owed *to the cargo owners* to use due diligence to make the ship seaworthy at the beginning of the voyage from Douala, a duty that encompassed proper inspection of the No. 4 lower hold. The Court found that, as between themselves, the two defendants herein, the charterer and the shipowner, had in the charter party allotted to the shipowner liability for nonperformance of this duty. The shipowner was thus liable for the failure to inspect; the charterer was found liable for its agents' negligence in causing the damage to the manhole cover in the first instance. The failure to inspect and the damaging of the manhole cover concurred in producing the ultimate injury to the cargo. The shipowner and the charterer were thus joint tortfeasors and their liability was computed accordingly.

As the Supreme Court said in Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 321, 84 S.Ct. 748, 752, 11 L. Ed.2d 732 (1964), "recovery of contribution between joint tortfeasors and recovery of indemnity for breach of warranty proceed on two wholly distinct theories . . . ." As should be clear, this case turns not on a theory of indemnity, but on a theory of joint tortfeasance. There was no holding that the shipowner owed a duty *to the charterer* to use due diligence at the beginning of the voyage to provide a seaworthy vessel.

■ As the Court noted in *Italia, supra*, consideration of a case under a the-

ory of indemnity may provide a different result than that which would be reached under the tort theory. However, in this case, even if one assumes, as defendant Barber Lines suggests, that there was a warranty running from the shipowner to the charterer, the result would be the same. Assuming *arguendo* that a warranty to charterer exists, the Court finds that the charterer is precluded by its own conduct from reliance on it.

As the Court of Appeals noted in considering a similiar warranty, that running from a stevedore company to the owner of a ship upon which the stevedore company worked, in Hurdich v. Eastmount Shipping Corp., 503 F.2d 397 at 401 n.3 (2d Cir. 1974), the issue of whether the warrantee has by its conduct precluded itself from reliance on the warranty is one of fact. In deciding that the charterer has precluded itself from reliance on any warranty from the shipowner, this Court, as suggested in *Hurdich, supra*, has considered which of the parties was best able to prevent the ultimate damage here.

The charterer has directed the Court's attention to Henry v. A/S Ocean, 512 F. 2d 401 (2d Cir. 1975). This Court was aware of this opinion, but considered it inapplicable since no finding of warranty was intended. The Court here finds, as did the jury in that case, that conduct by the charterer "obstructed or hindered" the shipowner in its effort to provide a seaworthy vessel. The damage done to the manhole cover was certainly such a hindrance, particularly since there was no evidence that the damage was reported to the ship's officers by the parties who caused it. Thus, assuming for purposes of argument that there was a warranty running from the shipowner to the charterer, the charterer was precluded from reliance thereon by its own conduct.

The foregoing constitute supplemental and amended findings as required by Fed.R.Civ.P. 52(a).

So ordered.