McALLISTER LIGHTERAGE LINE, Inc.,
Plaintiff-Appellee,

v.

INSURANCE COMPANY OF NORTH
AMERICA and Scott Paper Company, Defendants-Appellants.

No. 145, Docket 24295.

United States Court of Appeals
Second Circuit.

Argued Jan. 18, 1957.

Decided May 29, 1957.

As Amended on Denial of Rehearing
June 20, 1957.

Foley & Martin, New York City (Christopher E. Heckman, New York City, of counsel on the brief), for plaintiff-appellee.

Rawle & Henderson, Philadelphia, Pa., and Bigham, Englar, Jones & Houston, New York City (Harrison G. Kildare, Joseph W. Henderson, Philadelphia, Pa., and Richard F. Shaw, New York City, of counsel on the brief), for defendants-appellants.

Purdy, Lamb & Catoggio, New York City, for defendant-appellant Scott Paper Co.

Before MEDINA, HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

Defendants appeal from a judgment entered upon the verdict of a jury by

Albert L. Reeves, Judge, sitting in the Southern District of New York, in the amounts of $20,000 against the Insurance Company of North American and $3,456.19 against Scott Paper Company.

This action arose out of a charter of the McAllister scow 58 to the Scott Paper Company in August 1953. McAllister delivered the 58, a wood hull harbor scow built in 1911, to Scott at its Wilmington Marine Terminal on the evening of August 25, 1953. The following day McAllister and Scott executed a written demise charter of the scow for one year at $650 per month. The terms of the charter required Scott to furnish and pay the crew and furnish all victuals, supplies and equipment. Paragraph 4 of the charter provided: "The acceptance of said scow by the Charterer is to be conclusive evidence of the seaworthy condition of said scow at the commencement of this charter." The charter party required Scott at its expense to insure with full fire and marine insurance for the protection of owner and charterer "as interest may appear" in the sum of $20,000.

Just prior to the charter McAllister had drydocked the scow for an in-going survey at its expense, including the recaulking of the hull. On August 27 the scow was loaded with 605 short tons of wood pulp, a load well within the capacity of 700 tons. During the loading Scott's bargee, Samuel Church, found a small amount of water in the hull which he pumped out, before noon, with a gasoline pump aboard. Just before 6 P.M. he started the pump again to remove additional seepage. At 6:30 P.M. a tug proceeded to tow 58 toward the Scott plant at Chester, Pennsylvania, about 14 miles away, going down the Christiana River for three quarters of a mile with a fair current and then north on the Delaware River with increased engine speed against the ebbing tide.

The 58 was unattended because Church did not remain aboard as he had been instructed, but instead drove along the shore. Off Claymont, Delaware about 8:30 P.M. the mate on the tug noticed that 58 was listing slightly and upon going aboard a few minutes later the tug's captain found water "bursting right in." Within a few minutes the scow's rail was under water and the tug beached 58 at the ice breaker above Marcus Hook. There she sank before Church, who meanwhile had arrived from shore, could hook up a pump.

The 58 was later refloated and upon inspection at the marine railway it was found that the caulkers, working for McAllister to repair and fit the scow according to the agreement between Scott and McAllister, had neglected to recaulk a seam 18 inches long in the bottom planking. Though the seam was uncaulked for a space of 18 inches, certain interior structures reduced the clear opening to 10 inches. This much is undisputed, and from this it seems clear that the residue of old oakum left by the outfitters "blew out" as the 58 started up the Delaware River. It is undisputed that it was through the resulting 10 inch opening the 58 filled with water and sank.

Scott and North America filed a joint answer alleging that the insurance never became effective because the scow contained a hidden defect which breached McAllister's implied warranty of seaworthiness, that Scott had no knowledge or means of obtaining information regarding the unseaworthy condition of the scow, and that it could not be and was not observed on reasonable and proper inspection. Secondly, it was alleged that paragraph 4 of the charter was inoperative, since it was intended to apply only to patent defects.

McAllister moved to strike the second defense on the ground that acceptance of the scow pursuant to paragraph 4 of the charter was conclusive evidence of seaworthiness, and not restricted to patent defects. Judge Clancy granted the motion and struck the defense.

At the trial before Judge Reeves and a jury, McAllister sought to prove that the sinking was due solely to the negligence of Scott. It was urged that if

the barge captain had remained aboard and run the pump, the scow would not have sunk, since the opening in the seam would admit only 4,419 gallons of water per hour and the pumps could handle at least 5,800 gallons per hour.

The jury's answers to written interrogatories submitted to it may be summarized as follows:

1. The loss of the scow was proximately caused by Scott's negligence after the scow's delivery.

2. The reasonable cost of repairs was $23,456.19, and the market value was $20,000.

3. The scow was not unseaworthy when the policy endorsement was issued on August 26, 1953.

4. McAllister made representations to North America on August 26 regarding the scow which North America was justified in accepting as an assurance that the scow was then in sound condition, and McAllister was justified in doing so. The jury returned a general verdict for the plaintiff for $20,000 against North America and $3,456.19 against Scott. Subsequently Judge Reeves entered judgment against North America for $20,000, the face amount of the policy, and for $3,456.19 against Scott.

North America moved for judgment notwithstanding the verdict, but this motion, as well as both defendants' motions for a new trial, were denied by Judge Reeves.

North America appeals alleging that error was committed by Judge Reeves in denying its motion for judgment n.o.v. since the scow was unseaworthy when the policy was issued, and this was a breach of the policy's implied covenant of seaworthiness. Scott's appeal alleges error in Judge Clancy's striking its second defense and on the ground that the judgment entered by Judge Reeves is not supported by the evidence and excessive.

■■■ The conceded facts show that the vessel was unseaworthy. Seaworthiness is the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes. The Silvia, 1898, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 1903, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Steel Navigator, 2 Cir., 1928, 23 F.2d 590; The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737; Ondato v. Standard Oil Co., 2 Cir., 1954, 210 F.2d 233. Here the 58 had an 18 inch slit in her bottom which had not been recaulked. True, when she set out on the voyage in question the hole was stoppered by the old oakum which the caulkers had failed to replace, but when the 58 was put to a normal test this residue "blew out" and the water rushed in. A vessel which requires constant pumping at virtually the capacity of her pumps in order to keep afloat is not seaworthy. Were it otherwise, seldom would a vessel be unseaworthy as it could always be said that her defects were curable by emergency measures.

■■ The thrust of McAllister's case was that the vessel sank solely because of the negligence of Scott, in that Church's absence and his failure to man the pumps caused the damage. Though it may be true that vigilance by Church might have kept the 58 afloat, it does not relieve the owner from the obligation to deliver a seaworthy scow. With a term policy of insurance the warranty of seaworthiness arises at the time when the insurance becomes effective. See Union Co. v. Smith, 1888, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497; and Henjes v. Aetna Insurance Co., 2 Cir., 1943, 132 F.2d 715, certiorari denied 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711. Here the insurance became effective on August 28, when the scow was at the Scott pier in Wilmington. The scow did not begin her first voyage for Scott until the evening of the following day.

■ This unseaworthiness of the 58 precludes recovery from North America on the policy. Richelieu & Ontario Nav. Co. v. Boston Marine Ins. Co., 1890, 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398; New Orleans, T. & M. R. Co. v. Union Marine Ins. Co., 5 Cir., 1923, 286 F. 32; Gilmore and Black, The Law of

Admiralty (1957) page 57ff. It is clear that implied in every policy of hull insurance is a covenant of seaworthiness. The Caledonia, 1895, 157 U.S. 124, 131, 15 S.Ct. 537, 39 L.Ed. 644; Henjes v. Aetna Ins. Co., 2 Cir., 1943, 132 F.2d 715, 719, certiorari denied 1943, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711.

██ Nor is North America bound by Scott's acceptance of the scow and the provision in the charter making acceptance "conclusive evidence" of seaworthiness, for this provision was entirely unknown to the insurer. On these undisputed facts it was error to leave this question of unseaworthiness to the jury. Furthermore that North America never had any intention of waiving the implied warranty of seaworthiness is further shown by the proof of the inquiries which North America made prior to insuring the scow. The jury found, in answer to a special interrogatory, that McAllister had expressly warranted in conversation with North America's representative, the seaworthiness of the scow. Captain Hansen, the marine surveyor for North America, on request of the underwriter, telephoned McAllister to ascertain the scow's condition before she was accepted as a risk. McAllister's representative assured Captain Hansen that she was in sound condition. Clearly the purpose of the inquiry was to obtain information about the condition of the scow before placing the insurance, and this was known to McAllister's employee. No other source of information was available to the insurance company, as the vessel was then in Wilmington being loaded, and the company acted reasonably in relying on this warranty. Sun Mutual Ins. Co. v. Ocean Ins. Co., 1883, 107 U.S. 485, 510, 1 S.Ct. 582, 27 L.Ed. 337.

 The unseaworthiness of the 58 was a breach of an express warranty of the same nature as the law implies where nothing is expressly stated. Thus the policy of insurance was rendered void, and the motion for judgment n.o.v. made by the insurance company should have been granted.

We come now to the appeal from the judgment entered against Scott. Paragraph 4 in the charter agreement drawn by McAllister and accepted by Scott reads:

> "The acceptance of said scow by charterer is to be conclusive evidence of the seaworthy condition of said scow at the commencement of this charter."

In view of this clause, Judge Clancy granted the plaintiff's motion to strike from Scott's answer the defense of unseaworthiness, holding that the language was unambiguous and that it constituted a complete waiver of the warranty of seaworthiness. Scott contends on the other hand, that this waiver should be construed to apply only to latent or hidden defects.

██ The general rule is that a warranty of seaworthiness attaches to every charter. But the parties to a contract of private carriage are free to bargain as they please, and the warranty will not be implied where it is waived, as Judge Clancy correctly found here, in "plain and unequivocal" terms. Dempsey v. Downing, 4 Cir., 1926, 11 F.2d 15; Jordan, Inc., v. Mayronne Drilling Mud, etc., Service, 5 Cir., 1954, 214 F.2d 410.

██ And the finding of the jury that Scott was negligent and that the loss was due to this negligence finds adequate support in the evidence. Church was ordered to remain aboard the 58 precisely to prevent the type of damage which actually occurred. In leaving her he breached this duty and for this breach Scott is responsible. The jury was justified in concluding that if Church had remained aboard the 58 she would not have sunk. There was evidence that a hole such as appeared in the seam of the scow could easily be stoppered either with a rag or with a wooden wedge. Furthermore, the pumps aboard the 58 could have handled the leak had they been started in time and the vessel would have

remained afloat. Thus Scott's liability is clear.

But the judgment as to Scott must be reversed because of the error of the district court in its award of damages. The jury in response to special interrogatories found that the market value of the 58 was $20,000 and that the reasonable cost of repairs was $23,456.19, holding North America for $20,000, the face amount of the policy issued to cover the scow; and Scott for the $3,456.19 excess.

■■■■■ The object of the award of damages is to restore the injured party to the same position he held before the injury. O'Brien Bros., Inc., v. The Helen B. Moran, 2 Cir., 1947, 160 F.2d 502. Thus the customary measure of damages to be awarded for the total loss of a vessel is the market value of the vessel at the time of destruction. Standard Oil Co. of New Jersey v. Southern Pacific Co., 1924, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890. The plaintiff-appellee admits this, but argues that this rule applies only to cases sounding in tort, and is inapposite here, because of the contractual relationships that obtained between the parties. The argument lacks merit for the complaint and the entire thrust of the case is one of negligence and the relationships of the parties is, therefore, irrelevant.

■■■■■ On the other hand, Scott argues that the jury's finding of the $20,000 market value of the 58 is not supported by the evidence. Captain Hansen, the insurer's marine surveyor, testified that the scow was worth only $7,500. On the other hand the evidence showed that the rental value of the scow was $7,800 per year; the insurance value, agreed upon by the parties, was $20,000; and the reasonable cost of repairs, as found by the jury, was $23,456.19. The jury was justified in rejecting Hansen's testimony and finding that the market value was $20,000.

The record is complete and the jury findings specific, so that a new trial would serve no gainful purpose. Accordingly, we reverse the judgment, and direct entry of judgment against Scott for $20,000, and dismissal of the complaint against North America, with costs to North America.