**TEXACO, INC.**

v.

**UNIVERSAL MARINE, INC.,** in perso-
nam, the **M/V UNIVERSAL NOMAD,**
its engines, tackle, apparel, etc., in rem,
and the **BARGE UMI–1650,** its tackle,
apparel, etc., in rem.

**Civ. A. No. 72–825.**

United States District Court,
E. D. Louisiana.

Aug. 1, 1975.

Alfred M. Farrell, Jr., Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for plaintiff, Texaco, Inc.

James G. Burke, Jr., Burke & Ballard, New Orleans, La., for Universal Marine Inc., defendant.

Glenn C. Goodier and Robert B. Acomb, Jr., Jones, Walker Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Ins. Co. of North America, defendant.

**JACK M. GORDON, District Judge:**

The nature of this case is better described by a brief compendium of occurrences so as to provide a much needed overview before engaging in a definitive discussion of the facts.

Pursuant to a charter party entered into by Texaco, Inc., the plaintiff herein, and Universal Marine, Inc., the defendant, Texaco became the time charterer of a tugboat and tank barge. The purpose of the charter party was to acquire means of transporting hot roofing asphalt from Port Neches, Texas, to Mobile, Alabama. During the life span of the charter party, many trips had been made between these two ports without incident, but on December 15, 1970, while in route to Mobile, the barge, laden with its cargo of asphalt, sank in the Mississippi Sound.

Sometime after the sinking, the barge was struck by another vessel, the identity of which remains unknown. Thereafter, the barge was salvaged and transported to Mobile, Alabama, where two-thirds of its cargo was sold to the original buyer, but this buyer refused to accept delivery of the other one-third of the cargo, claiming that the remainder had been damaged by water and oil contamination.

The parties involved and their respective claims are more orderly summarized by a cursory review of the pleadings. The plaintiff, Texaco, Inc. (hereinafter referred to as Texaco), has filed the original complaint in this case against Universal Marine, Inc. (hereinafter referred to as Universal Marine or Universal), *in personam*, and against the M/V UNIVERSAL NOMAD and the Barge UMI–1650 *in rem*, seeking damages it sustained when the barge sank while carrying asphalt owned by Texaco. Universal Marine filed, in response, a counterclaim against Texaco seeking to recover its expenses of salvaging the sunken barge, claiming that the charter party between Texaco and Universal contained provisions requiring Texaco to contribute in General Average. Subsequently, Universal Marine filed a third party complaint against Insurance Company of North America (INA) upon

being informed that INA was refusing coverage under the existing Hull and P & I policies on the tugboat and barge. Universal claims that it is entitled to recover from INA the salvage costs and indemnification for any judgment rendered against it. Finally, in its answer to the third party complaint, INA filed a counter claim against Universal claiming the aggregate amount it spent in salvaging the barge in question. In response to Insurance Company of North America becoming a party, Texaco amended its Complaint to include INA as a party defendant.

The trial of this matter began on April 1, 1974, with only the issue of liability being before the Court. The issue of damages was reserved for further proceedings. After considering the evidence adduced at trial, the arguments of, and briefs submitted by counsel, the Court makes the following findings of fact and conslusions of law.

## FINDINGS OF FACT

### I.

Plaintiff, Texaco, Inc., is a corporation organized under and existing by virtue of the laws of the State of Delaware. Defendant, Universal Marine, Inc., is a corporation organized under and existing by virtue of the laws of the State of Delaware, with its principal Louisiana place of business in New Orleans, Louisiana.

### II.

The M/V UNIVERSAL NOMAD and the Barge UMI–1650 are both owned and operated by the defendant and are now or will be during the pendency of this litigation, within this district.

### III.

The relationship between Texaco and Universal was established via charter party. Under the terms of this time charter Universal Marine was to provide a tank barge and a fully found towboat to Texaco for the transportation of hot roofing asphalt refined in Texaco's Port Nechez, Texas, facilities. The cargo was to be delivered to the GAF Corporation, Ruberoid Division, in Mobile, Alabama. The nature of the charter party was such that Universal Marine was to make as many round trip voyages as possible within the one year life span of the contract, which began on the date of first loading which was on or about January 20, 1970.

### IV.

The M/V UNIVERSAL NOMAD, the tugboat pushing the UMI–1650 when it sank, was owned and operated by Universal Marine, Inc. The vessel was 54 feet long, 22 feet wide, and was powered by two engines combining to develop a total of 400 horsepower. The compliment of the vessel consisted of four men, two of whom played significant roles in this cause of action. Mr. Keith T. Taunton was the Captain aboard the M/V UNIVERSAL NOMAD and was the acting pilot at the time of the sinking. W. E. Hill, Jr. was the tankerman and as such had the responsibility of loading and unloading the UMI–1650.

### V.

The Barge UMI–1650 was basically an open hopper barge measuring 190 feet long and 50 feet wide, with a forward rake and an after rake section, a centerline bulkhead and a bulkhead athwartship. In order to carry liquid cargo, six cylindrical tanks had been built into the open hopper compartment and were arranged with three tanks lying abreast in the forward half of the compartment, and three abreast in the after portion of the barge. All tanks ran fore and aft. The barge was also equipped with the necessary valves and hose connections used to facilitate loading. However, before the barge entered the service of Texaco, it had to undergo certain modifications before it would be acceptable for hauling liquid asphalt. First a piping system had to be installed for the purpose of heating the asphalt to a tem-

perature which would keep it in a liquid state, and, second, a pump had to be installed on the foredeck of the barge to provide the capability of unloading its cargo.

Other features of the barge include a splashboard or coaming rising approximately two and one-half feet above the deck, the purpose of which was to prevent wavewash from entering the open hopper compartment.

Other characteristics of both the M/V UNIVERSAL NOMAD and the UMI–1650 have been reserved for a discussion of the alleged unseaworthy conditions of these vessels.

## VI.

## THE VOYAGE

Pursuant to the contractual arrangement as described in the charter party, Universal Marine had made numerous round trips from Port Neches, Texas, to the GAF Plant in Mobile, Alabama, each of which took approximately ten to twelve days. In the early hours of December 11, 1970, the flotilla (the M/V UNIVERSAL NOMAD and the UMI–1650) was preparing for another routine trip. Loading operations began at 0015 hours on December 11, with tankerman W. E. Hill, Jr. supervising the pumping of asphalt into the barge. Although Hill had valves which allowed him to load any cylindrical tank to a desired level, he still had to work in close harmony with the employees of Texaco, as the shore side pumping operation had to terminate before the valves on the UMI–1650 were closed. A reversal of this order would result in bursting the pumping hoses. Accordingly, the tankerman would transmit an order to the Texaco employees to halt pumping actually prior to filling the barge to the desired draft.

At 4:50 the loading operations had been completed, but not before a spill had occurred while loading the starboard bow tank. In his routine report to Captain Taunton, who had been asleep during the entire process, Hill explained that the barge had a draft of eight feet at each corner, but that a spill had occurred resulting in some asphalt settling to the bottom of the barge at the starboard bow corner. Sometime after 7:00 a. m. on the 11th of December, the flotilla broke ground and proceeded toward Mobile. According to Mr. Walter Searcy, the operations manager of Universal Marine, the M/V UNIVERSAL NOMAD reported the spill of asphalt to Mr. Treschwig the morning after loading was completed. At approximately 0600 a. m. on December 15, 1970, the flotilla entered the Mississippi Sound. Three hours later, at 0900, the flotilla began encountering north-northeast winds of approximately 15 miles per hour. According to Captain Taunton, whitecaps had developed, and the UMI–1650 began taking sea water in its open hopper compartment. Before Taunton was able to get pumps on the barge, it sank in about twelve feet of water, some forty minutes after first encountering the change of weather.

## VII.

## THE SALVAGE

After the barge sank on December 15, 1970, both Universal Marine and Neare-Gibbs, the insurance underwriter, recognized that the sunken condition of the UMI–1650 presented a serious obstruction to navigation and hence both undertook to raise the barge. Unfortunately, their efforts were less than coordinated. Under the impression that it was acting for the joint account of Universal Marine and Neare-Gibbs, Neare-Gibbs immediately contacted the marine surveying company, Bachrach & Wood Assoc. Inc. to request their assistance and advice in raising the barge. When Captain Bachrach tried to send men to the site, however, he encountered resistance from Walter Searcy who was already attempting to raise the UMI–1650. After Searcy's attempt on or about December 27, 1970, met with unfavorable results, Bachrach & Wood Assoc. Inc. was allowed to solicit bids for the needed salvage job. As a result, Southern Shipyard agreed

to salvage the barge, but only with Neare-Gibbs guaranteeing the salvage contract. Southern Shipyard commenced operations on or about February 15, 1971, and after successfully salvaging the barge, was paid on February 23, 1971, by a check from Neare-Gibbs in the amount of $35,000. It is significant to note, however, that the UMI–1650 was struck by an unidentified vessel ostensibly between January 7, 1971 and February 15, 1971, causing damages to the starboard bow tank and coaming.

After Southern Shipyard had raised the barge, Ryan F. Uhlich, a marine surveyor working at the time for Bachrach & Wood Assoc. Inc., had the responsibility of trying to tow the UMI–1650 back to Mobile, Alabama. In an attempt to keep the barges as "dry" as possible during the trip to Mobile, Mr. Uhlich was pumping the internal compartment every two or three hours. Just prior to the start of the voyage to Mobile, Mr. Uhlich had occasion to perform a complete survey of the UMI–1650 and to photograph its condition. The survey and photographs will be discussed at length later, but suffice it to say here that the barge was floating but had minus three inches of freeboard on the starboard bow and a positive freeboard on the port side. Unfortunately, there is no way to be sure that that condition resembled the condition of the barge prior to the sinking and subsequent collision.

After the successful trip to Mobile, the barge was docked in the Federal Barge fleet and remained there until it was removed to Greenville, Mississippi. While berthed in the Federal Barge fleet, the barge underwent many surveys, the result of which will be discussed shortly.

## VIII.

### THE BARGE

It has been alleged by Texaco that two conditions existed aboard the UMI–1650

either of which would have rendered the barge unseaworthy. First, Texaco avers that a spill of hot asphalt during loading operations accumulated with pre-existing debris in the starboard bow of the barge, causing the barge to sail with little or no freeboard. Second, Texaco argues that during certain construction work designed to modify the UMI–1650, certain holes were cut into the coaming located on the foredeck. It is argued that the lack of freeboard at the head of the barge together with these uncovered holes in the coaming combined to cause the barge to absorb an abnormal amount of sea water in its internal compartment.

The plaintiff's argument regarding the spill of asphalt is essentially that such spill added enough weight to the starboard bow of the UMI–1650 to cause it to lose what little freeboard it already had. To determine the existing freeboard prior to the spill, the simple calculation of subtracting from the total draft capacity of the barge, the draft resulting from the load is required. Although the calculation is elementary, the Court must first determine the UMI–1650's draft capacity. There has been considerable testimony by Mr. Julius Leo Weisgerber [1] to the effect that the UMI–1650, had a draft of between 7.9 and 8 feet. On the other hand, the defendant has introduced a blueprint [2] which it argues is an accurate diagram of the UMI–1650, contending it shows the barge to have a draft of 8½ feet.

Upon close inspection, this Court concludes that the blueprint is an accurate drawing of the barge in question and further concludes that the barge *measured* 8 feet 6 inches from the center keel to the gunwale, but measured only 8 feet 2 inches from the corner of the bottom plating and the outer bulkhead to the same gunwale. Moreover, this Court is impressed by the fact that the plimsoll marks on the blueprint indicate a

---

1. Mr. Weisgerber, President of Bachrach & Wood, Assoc., Inc. has been recognized by the Court as an expert in the field of Marine Surveying.

2. Marked for identification as Third Party Defendant No. 7.

maximum draft of 7 feet, thus suggesting that an appropriate freeboard measurement would be 1½ feet.

Since the tankerman, W. E. Hill, Jr., had ostensibly loaded the UMI–1650 to a draft of 8 feet, this Court finds that, absent any spill, the barge was drawing water to within six inches of its gunwales. It now becomes important to determine whether a spill of hot asphalt occurred, and, if so, the effects of such spill on the already minimal freeboard.

There is no doubt that during the early morning hours of December 11, 1970, the tankerman, W. E. Hill, Jr., witnessed a spill of asphalt while loading the UMI–1650, for he reported the spill to his superior, Captain Keith T. Taunton. The question remains, however, whether this spill together with possible pre-existing debris in the starboard bow of the UMI–1650 caused the barge to sail with less than 6 inches of freeboard.

Mr. Ryan F. Uhlich, the marine surveyor who assisted in salvaging the barge, was allowed by the Court to testify as an expert in the field of marine surveying. Mr. Uhlich was quite familiar with the UMI–1650, as he had visited the site of the sunken barge on three separate occasions. On January 6 and 7, 1971, Uhlich had visited the site and had witnessed the progress made by Universal Marine during their unsuccessful attempt at salvaging the barge. The third trip by Uhlich to the site was February 15, 1971, and this visit was significant, since the barge had been successfully raised, thus revealing for the first time the possible cause of the original sinking. During an examination of the barge's bottom plating, Mr. Uhlich testified that he observed an accumulation of asphalt located in the starboard bow section of the open hopper compartment. Upon being asked the magnitude of the accumulation, Uhlich responded that his best estimate would describe the asphalt as being eighteen inches thick on the starboard outboard side, and covering an area of approximately ten feet by fifty feet. The depth of this mass of asphalt tapered off toward the centerline of the barge.

The UMI–1650 was surveyed on a number of other occasions after its initial survey of February 15, 1971. On August 31, 1971, and September 13, 1971, Mr. R. H. Cioll, an independent marine surveyor, visited the barge and reported, "Forward hopper contained approximately four to six inches of heavy water, a heavy residual material with some asphalt." Two other surveys were conducted, one by Mr. Robert Allen, the staff surveyor for Neare-Gibbs, and one by Stickney Marine Survey Co. The survey by Mr. Allen, conducted July 25, 1971, while the barge was in the Federal Barge Line fleet, indicated no asphalt in the forward compartment of the barge. The subsequent survey by Mr. Stickney, conducted on August 2, 1971, reported, "The hopper box compartment contained from approximately twelve to eighteen inches of water and asphalt cargo."

In considering the numerous surveys of the UMI–1650, the Court concludes that the best evidence of the condition of the barge when it sank on December 15, 1970, was the description provided by Mr. Ryan Uhlich inasmuch as his survey was performed immediately upon raising the barge and was not obscured by any subsequent accumulation of rainwater, as were the surveys of Mr. Stickney, Mr. Cioll and Mr. Allen.

This Court, therefore, concludes that upon leaving the Port Nechez port, the UMI–1650 had less than a six inch freeboard and sailed on December 11, 1970, even though it was down by the bow. The Court reaches this conclusion not only from the above analysis of each survey, but from the fact that Captain Taunton's testimony was the subject of a constant credibility attack. His testimony in Court to the effect that the spill had had no effect on the freeboard of the barge was in direct conflict with his testimony in preceding depositions wherein he stated that the barge was down by the head by at least six inches.

For this reason, Captain Taunton's testimony to the effect that the UMI–1650 was seaworthy on December 11, 1970, has been disregarded by this Court.

It is further found by this Court that the asphalt found in the UMI–1650 was a product of either the spill of December 11, 1970, or of a preexisting accumulation and that the collision between the sunken barge and an unidentified vessel had no causal connection with the asphalt found in the starboard bow of the barge.

As an additional assault upon the seaworthiness of the UMI–1650, the plaintiff introduced pictures taken on February 15, 1971, by Mr. Uhlich which show freshly patched holes in the forward bulwark section which separated the open hopper from the foredeck.[3] Apparently the holes were cut into the bulwark to allow a piping system to be installed. The piping system was to be used for heating asphalt to a liquid state and such conversion was necessary before the UMI–1650 could be used in the asphalt trade.

On or about February 15, 1971, after the barge had been raised, Mr. Uhlich boarded the barge to search for manifest causes of her sinking. His testimony indicated that upon inspection, he recognized open holes which were located between the rake section and the hopper section and made notes to that affect. Subsequently, but on the same day, Mr. Uhlich came back to the holes and noticed that they had recently been patched in preparation of the voyage back to Mobile. At this point, Mr. Uhlich photographed the freshly patched holes.

This Court upon reviewing the evidence, concludes that certain holes were cut in the forward bulwark of the UMI–1650, but further concludes that no evidence was introduced to affirmatively establish that these holes were, in fact, a proximate cause of the sinking, or that the holes were not stuffed or covered prior to the fated voyage. The only evidence the Court has before it establishes that the holes in question were not stuffed or patched when the barge was salvaged, leaving open the very real possibility that stuffing may have existed prior to the voyage, only to have been washed away upon the sinking.

## IX.

### INSURANCE

Because there has been a declination of coverage by the marine insurer who had written policies on the vessels in question, another issue requiring a factual explanation exists.

Universal Marine, to acquire insurance for its fleet, requested that Corroon & Black Co. find an underwriter for the needed protection. Acting as Universal Marine's broker, Corroon & Black approached Neare-Gibbs, Inc., which was a marine manager for Inland Waterways Insurance Corporation, a corporation composed of several marine insurance underwriters. As a result of negotiations, the Insurance Company of North America, through Neare-Gibbs, Inc., agreed to underwrite the needed insurance, and as a result, Hull and Protection & Indemnity policies were written on the Barge UMI–1650 and the M/V UNIVERSAL NOMAD. The coverage of these policies extended from January 1, 1970, to January 1, 1971. Therefore, absent any specific reason to deny coverage, both vessels were insured on December 15, 1970, the date of the sinking. After January 1, 1971, new policies were issued which effectively renewed the expired protection. According to Wallace J. Peipmeier, who was the manager of the Loss Department of Neare-Gibbs, Neare-Gibbs renewed both the Hull and P & I policies although the company knew that the UMI–1650 lay in a sunken state in the Mississippi Sound.

After the UMI–1650 was raised, and after Neare-Gibbs tendered the cost of salvage to Universal Marine, Neare-

---

3. Marked for identification as Third Party Defendant No. 7, Photographs Nos. 40, 41 and 42.

Gibbs made an additional tender on June 29, 1971, to Universal Marine, of $35,000. If this had been accepted by Universal Marine, it would have relieved Neare-Gibbs of the P & I obligation on the barge as well as any liability under the Hull policy. Universal Marine did not accept the check. The Court finds that both of these tenders were made prior to receiving any indication that Universal Marine had knowledge of the unseaworthy condition of the UMI–1650.[4]

Ostensibly, Neare-Gibbs did not seriously consider declining coverage under the outstanding policies until sometime after Texaco, Inc. had initiated this litigation (April 1, 1972) against Universal Marine. On June 12, 1972, Mr. Peipmeier wrote Mr. David Armstrong of Corroon & Black, expressing the enigmatic position that Neare-Gibbs would find themselves in if Texaco prevailed in proving that the barge was unseaworthy, since such finding could be the basis for a declination of coverage.

Thereafter, Mr. Peipmeier made several genuine attempts to ascertain specific facts regarding the seaworthiness of the UMI–1650. These attempts included conversations with Mr. James Burke, who at the time was representing Universal Marine and its insurer Neare-Gibbs. Of significance is a conversation between Peipmeier and Burke on October 23, 1972, wherein Mr. Burke indicated that he had some statements made by Captain Taunton concerning the voyage in question. It was not until March 15, 1973, that Mr. Peipmeier re-

ceived a letter, together with a transcript, of a telephone conversation between Captain Taunton and Mr. Burke which revealed that Captain Taunton had broken ground on December 11, 1970, with the UMI–1650 down at the starboard bow due to an accumulation of asphalt and debris. Based upon the letter of March 15, 1973, from Mr. Burke, together with the enclosed materials, Mr. Peipmeier mailed to David Armstrong (manager of the Adjusting Department of Corroon & Black) a letter dated March 29, 1973, declining coverage under the Hull policy.

## CONCLUSIONS OF LAW

It is now this Court's task to evaluate the foregoing conclusions of facts, against a backdrop of legal responsibilities in an effort to determine whether any party is entitled to judicial relief.

### I.

The most obvious starting point in this regard must begin with a recognition of maritime jurisprudence which requires an owner-operator to provide a seaworthy vessel to a time charterer. Under the jurisprudence of maritime law, it is frequently recognized that the law infers a general warranty of seaworthiness from a charter party agreement even where such warranty is not expressly made. *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422 (5th Cir. 1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); *The Caledonia,* 157 U.S. 124, 131, 15 S.Ct. 537, 540, 39 L.Ed. 644

---

4. It appears possible that Neare-Gibbs, may have received notice of an accumulation of asphalt in the UMI–1650 as early as February 22, 1971, since on this date Robert Allen submitted a vague report to Mr. Peipmeier concerning the prior survey of Mr. Ryan Uhlich. Mr. Peipmeier, however, testified that he had no knowledge of any debris or asphalt accumulation in the UMI–1650 until receiving Mr. R. M. Coill's survey of September 13, 1971, in which it said, "Forward hopper contained approximately four to six inches of heavy water, a heavy residual material with some asphalt." In any event,

Neare-Gibbs had the barge surveyed on a number of occasions during the months of July, August, and September, 1971, and this Court finds such surveys were inconclusive since the true condition of the barge prior to the fated voyage was obscured by a subsequent accumulation of rain water in the open hopper barge. Furthermore, Neare-Gibbs at that time was unaware that Captain Taunton had knowledge of an accumulation of asphalt in the open hopper, and did not obtain such information until sometime in 1972.

(1895); *McAllister Lighterage Line, Inc. v. Insurance Company of North America*, 244 F.2d 867, 871 (2nd Cir. 1957); *Thomas Jordan, Inc. v. Mayronne Drilling Mud, etc.*, 214 F.2d 410 (5th Cir. 1954); *Coca Cola Co. v. S. S. Norbolt*, 1972 AMC 388 (S.D.N.Y.1971); *Neubros Corp. v. Northwestern National Insurance Co.*, 359 F.Supp. 310 (E.D.N.Y.1972). In the instant case, it is unnecessary to imply such a warranty, inasmuch as the charter party has expressly provided for such warranty.[5]

## II.

■ Since the term "seaworthy" is a relative one, its meaning is dependant upon the vessel involved and the service in which it is to be employed. In general, a ship must be sufficiently strong and staunch and equipped with the appropriate appurtenances to allow it to safely engage in the trade for which it was intended. Put another way, the vessel must be fit for the use anticipated. *Horn v. Cia de Navegacion Fruco, S.A., supra*, 404 F.2d 422 (5th Cir. 1968); *California & Hawaiian Sugar Refining Corp. v. Winco Tankers, Inc.*, 278 F.Supp. 648 (E.D.La.1968); *See also, J. Gerber & Co. v. S. S. Sabine Howaldt*, 437 F.2d 580 (2nd Cir. 1971). For example, a ship which holds itself out for transatlantic commerce during winter months must be able to withstand the seasonal weather which is to be expected at that time of year. *Blanchard Lumber Co. v. S. S. Anthony II*, 259 F.Supp. 857 (S.D.N.Y.1966); *Artemis Maritime Co. v. Southwestern Sugar & Mol. Co.*, 189 F.2d 488 (4th Cir. 1951).

## III.

■ Ordinarily, when a charterer claims that a shipowner has breached the charter party by providing an unseaworthy vessel, the burden of proving such a breach rests upon the claimant. *Worldwide Carriers Limited v. Aris S.S. Co.*, 301 F.Supp. 70 (S.D.N.Y.1969). Inasmuch as this burden is an extremely onerous one in circumstances where the claimant is in no position to know or obtain the facts surrounding an occurrence, the jurisprudence has recognized a presumption of unseaworthiness when a vessel founders in clear, calm weather. *Frederick Snare Corp. v. Moran Towing and Transportation Co., Inc.*, 195 F.Supp. 639 (S.D.N.Y.1961); *South, Inc. v. Moran Towing and Transportation Co.*, 252 F.Supp. 500 (S.D.N.Y.1965), *aff'd* by 2nd Cir., 360 F.2d 1002 (1966). If such a presumption is applicable under the facts of a given lawsuit, then the defendant must come forward with sufficient evidence to rebut the presumption. The defendant's failure to carry this burden of rebuttal results in the finding of unseaworthiness. *Interstate Steel Corp. v. S. S. Crystal Gem*, 317 F.Supp. 112 (S.D.N.Y.1970).

■ Under the factual circumstances of this litigation, the Court is unwilling to recognize the presumption of unseaworthiness. The case is a close one, however, inasmuch as the Court feels that the weather conditions encountered were not out of the ordinary. But, because the conditions were not "clear and calm" as required by the jurisprudence, such presumptions must not be applied. Accordingly, the plaintiff must come forward with evidence to establish by a preponderance of the evidence, the unseaworthiness of the UMI–1650.

## IV.

In the instant case, unseaworthiness has been alleged in two particulars. First, that the Barge UMI–1650 sailed with inadequate freeboard to make the anticipated voyage. Second, that holes had been cut in the bulwark just aft of

---

5. The Barge Charter Party dated December 12, 1969, reads:

CONDITION OF EQUIPMENT

Owner will use due diligence at all times to maintain the barges in a seaworthy, staunch, tight and suitable condition, and to provide sufficient towing power to properly handle barges loaded and light.

the foredeck which had not been patched before the fated voyage.

Because Texaco has alleged that the UMI–1650 was rendered unseaworthy by Universal Marine's improperly loading the barge, the Court must first determine whether improper loading of a vessel can create an unseaworthy condition.

 Upon reviewing the clear expressions of the relevant maritime jurisprudence, this Court finds that a vessel otherwise strong and staunch may be unseaworthy because of its lack of sufficient freeboard. *Petition of Long*, 439 F.2d 109 (2nd Cir. 1971); *Ionion Steamship Co. v. United Distillers*, 236 F.2d 78, 81 (5th Cir. 1956); *Indien*, 71 F.2d 752 (9th Cir. 1934). Ordinarily, and in the absence of an express agreement to the contrary, the Captain of a vessel will be responsible for loading and unloading his ship or barge. In discussing his responsibilities, the Fifth Circuit said:

> "The Captain occupies a dual role with regard to such decisions. He acts for the shipowner where his stowage decisions are made with regard to the seaworthiness and safety of the vessel; he acts for the cargo owner where his decisions do not affect the seaworthiness or safety of the vessel, but affect the safety of the cargo only." (cites authority).

*Horn v. Cia de Navegacion Fruco, S. A., supra*, at 433.

*See also, Nichimen Co. v. M. V. Farland*, 462 F.2d 319 (2nd Cir. 1972).

It is evident from the facts as presented, that the Captain was acting only with regard to the seaworthiness of the UMI–1650 when loading the barge. Even absent such jurisprudence, however, the terms of the charter party specifically place upon the Captain or his tankerman the responsibility of properly loading the UMI–1650. The contractual language to this effect reads:

LOADING: Universal Marine, Inc. will furnish tankermen to load barges at Port Neches. Universal Marine's tankermen will only be responsible for connecting and disconnecting the hose to the permanent shore connection and for the manipulation of valves on the barge. The tankermen will also be responsible for the loading draft as determined by the Captain of the vessel to assure a safe voyage.

 It was W. E. Hill's responsibility, therefore, to correctly load the UMI–1650, allowing enough freeboard to insure a safe passage through the sometimes rough seas encountered in the Mississippi Sound.

Commensurate with this responsibility, Hill loaded the UMI–1650 to what he reported to be an eight foot draft at each corner. This Court, however, finds that the draft allowed at most only six inches of freeboard, and is inclined to believe that the spill in the starboard bow section of the barge reduced the freeboard there to only two to three inches.

 In short, this Court finds that, on December 11, 1970, when the UMI–1650 broke ground it was not fit for its anticipated use, since the Captain and everyone involved knew or should have known that a freeboard of two to three inches was insufficient for a voyage through the Mississippi Sound.

V.

DEFENSES

 It appears from a reading of the barge charter party that the parties have modified the seaworthiness warranty and thus cut it down to COGSA [6] dimensions; that is, to the level of due diligence. Under this modification, the shipowner has the legal duty to use due diligence to make his vessel seaworthy. See, 46 U.S.C. § 1304(1). Once a prima facie case of unseaworthiness has been made by a complainant, however, the owner must then bear the burden of proving the exercise of due

---

6. Carriage of Goods by Seas Act, 46 U.S.C. § 1300 *et seq.*

diligence to make the vessel seaworthy. *J. C. Penny Co. v. American Express Co.*, 102 F.Supp. 742 (S.D.N.Y.1951), *aff'd*, 201 F.2d 846 (2nd Cir. 1953). This Court concludes that the owner failed to exercise due diligence to make the vessel seaworthy at the start of the voyage by not insuring that the UMI–1650 had adequate freeboard to make the anticipated voyage, and by failing to recognize holes in the forward bulwark.

As a further defense to the alleged unseaworthiness of the barge, the defendant contends that the unexpected increase of wind velocity and the concomitant high seas were forces beyond the Captain's control and as such, would relieve the defendant of any liability. Such defense is commonly referred to as the defense of force majeure.

█ Here, as in most cases, there was an issue of fact as to the severity of the weather incurred immediately prior to the casualty. The vessel's log reflects that at approximately 9:00 a. m. the winds in the Mississippi Sound were between ten and twelve miles per hour. The Captain, on the other hand, testified that such winds had increased to between fifteen and eighteen miles per hour. But even if this Court were to accept as true the often impeached testimony of Captain Taunton, these weather conditions can hardly be sufficient to buttress a force majeure defense, since such conditions are to be reasonably anticipated in the open waters of the Mississippi Sound. *Artemis Maritime Co. v. Southwestern Sugar & Mol. Co.*, *supra*, 189 F.2d 488 (4th Cir. 1951); *Bright Star S.S. Co. v. Industrial Molassas Corp.*, 1973 AMC 2005, 2009 (Arbitration at New York, 1973); *J. Gerber & Co. v. S.S. Sabine Howaldt*, 437 F.2d 580 (2nd Cir. 1971).

## VI.

### INSURANCE

█ As discussed in the findings of fact, the UMI–1650 and the M/V UNI-

VERSAL NOMAD were protected under both Hull and Protection & Indemnity (hereinafter referred to as P & I) policies issued by Insurance Company of North America through Neare-Gibbs. It is clear that under the existing P & I policy on the UMI–1650 the Insurance Company of North America is liable in indemnity to Texaco, Inc. for damages sustained by the liability of Universal Marine. It is also clear that the Protection & Indemnity policy covers damages to cargo notwithstanding the fact that the vessel insured may have been unseaworthy. It would be a *non sequitur* to conclude that the unseaworthiness of the UMI–1650 would negate coverage under a policy whose purpose is to protect for the insured's own negligence.

A more cogent argument is made by Insurance Company of North America in its attempt to decline coverage under the existing Hull policy written on the UMI–1650. It is INA's contention that since the UMI–1650 was unseaworthy and indeed rendered unseaworthy by the affirmative action of Universal Marine's employees, the Hull policy would not cover losses caused by such unseaworthiness.

█ It is abundantly clear that all insurance agreements, including Maritime insurance, are *uberrima fides*,[7] and hence are based upon complete candor to disclose all facts materially affecting the risk involved. Therefore, because all hull policies rely upon the seaworthiness of the vessel insured, any known and material variation from this condition would substantially increase the risk. For this reason, the law recognizes that an insured must either expressly or impliedly warrant to his insurer the seaworthiness of his vessel. The Court in *Neubros Corporation v. Northwestern National Ins. Co.*, 359 F.Supp. 310 (E. D.N.Y.1972) said:

"Just as the warranty of seaworthiness is implied in every charter unless expressly waived, so it is implied in

7. See, e. g., 45 C.J.S. Insurance § 645a.

every hull policy of insurance unless expressly waived. *McAllister Lighterage Line, Inc. v. Insurance Co. of North America,* 244 F.2d at 871. The argument that such warranty is implied in voyage hull policies but not in time hull policies is not supported by American case law. It is well established that the warranty of seaworthiness attaches to a time hull policy at the time the policy becomes effective. *Henjes v. Aetna Insurance Co.,* 2 Cir., 132 F.2d 715; *Tropical Marine v. Birmingham Fire Ins. Co,* 247 F.2d 116, 119 (5th Cir. 1957), cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2nd 260."

Although there is clearly a warranty of seaworthiness on every vessel securing insurance, the scope of such warranty and the time at which it becomes effective are quite significant.

■ As a general rule and a logical starting point, the warranty of seaworthiness, with regard to a term policy, arises at the time when the insurance policy becomes effective. In other words, the warranty attaches at the commencement of the risk. *McAllister Lighterage Lines v. Insurance Co. of North America, supra,* at 870; *Lemar Towing, Inc. v. Fireman's Fund Ins. Co.,* 352 F.Supp. 652 (E.D.La.1972), *aff'd,* 5 Cir., 471 F.2d 609, *rehearing denied,* 5 Cir., 478 F.2d 1402, *cert. denied,* 414 U. S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

As this is a general rule, there are variations to it depending upon the type of charter being considered. The accepted standard for time policies in the United States, as opposed to the English rule,[8] is better described by referring to a passage in *Saskatchewan Government*

*Ins. Co. v. Spot Pack,* 242 F.2d 385 (5th Cir. 1957).

"The American Rule, in a rare departure from a determined course of parallel uniformity, *Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co.,* 263 U.S. 487, 44 S.Ct. 175, 68 L. Ed. 402, implies for a time policy, as does the English Rule as of the commencement of the voyage for voyage policies, 2 Arnould, op. cit. *supra,* §§ 691, 695, a warranty of seaworthiness as of the very moment of attachment of the insurance. And, unlike the English Rule which limits the warranty to the commencement of the voyage, the American Rule takes it somewhat further to extend, in point of time, a sort of negative, modified warranty. It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term. It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness." *Saskatchewan Government Ins. Office v. Spot Pack, supra,* 242 F.2d 385, 388.

In a more recent decision by the Fifth Circuit Court of Appeals, the American Rule was defined as follows:

"Under the American rule, a warranty of seaworthiness is implied as of the very moment of attachment of

8. "In England, in a time policy, there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness. (Marine Ins.

Act. Section 39). However, the insurer must show that the loss was attributable to the unseaworthiness of which the assured was aware." Leslie J. Buglass, Marine Insurance and General Average in the United States, p. 21 (1st Ed. 1973).

the insurance. Under the American rule once the warranty is satisfied (as it clearly was not here) the warranty thereafter becomes a modified 'negative' one in which it is warranted that the owner, from bad faith or neglect will not knowingly permit the vessel to break ground in an unseaworthy condition." *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.*, 409 F.2d 974, n.26, (5th Cir. 1969).

*Accord, Lemar Towing, Inc. v. Fireman's Fund Insurance Co., supra,* 352 F.Supp. 652 (E.D.La.1972); *see also, Aguirre v. Citizens Casualty Company of New York,* 441 F.2d 141 (5th Cir. 1971); *Mattson v. Connecticut Fire Ins. Co. of Hartford,* 80 F.Supp. 101 (D. Minnesota, Fifth Division, 1948).

 Clearly, therefore, the Insurance Company of North America has the burden of proving that the shipowner, Universal Marine, acted out of bad faith or neglect by knowingly permitting the UMI–1650 to sail in an unseaworthy condition.

At first blush it might appear inconsistent to hold Universal Marine liable to Texaco for failing to provide a seaworthy vessel and on the other hand to hold that Universal Marine had not breached its warranty to provide a seaworthy vessel for insurance purposes. However, upon closer inspection, there can be found basic distinctions between the two claims which make them far less similar than they might otherwise appear.

First and foremost, the legal duty owned by Universal Marine vis-a-vis Insurance Company of North America is completely different from that duty of providing a seaworthy vessel as it relates to a cargo owner. In the first case, the shipowner has a negative duty

in that he must not, from bad faith or neglect, allow his vessel to sail in an unseaworthy condition. In the latter case, however, the shipowner is under a nondelegable duty to provide a seaworthy vessel. Recognizing the distinction between these two legal duties, the United States Supreme Court in *Earle & Stoddart v. Ellerman's Wilson Line,* 287 U.S. 420, 53 S.Ct. 200 at 201, 77 L.Ed. 403 (1932), said:

> ". . . [I]n every contract of affreightment there is, unless otherwise expressly stipulated, an imputed warranty of seaworthiness at the commencement of the voyage. The warranty is absolute that the ship is in fact seaworthy at that time, and the liability does not depend upon the knowledge or ignorance, the care or negligence, of the shipowner or charterer. Obviously, those cases lend no support to the contention that breach of the implied warranty of seaworthiness constitutes "neglect" of the vessel owner under the fire statute." Id. at p. 201.

Inasmuch as the fire statute required, at the time of the Supreme Court's decision, much the same responsibility of the shipowner as is required of the shipowner in the instant case, the *Earle & Stoddart* case is quite relevant.[9]

 It is quite possible, therefore, that the negligence of a master or crewman could render a vessel unseaworthy, thereby casting liability upon the shipowner in cases involving allegations of a breach of a nondelegable duty. *See, Horn v. Cia de Navegacion Fruco, S.A., supra,* 404 F.2d 422 (5th Cir. 1968). However, this same negligence which caused the vessel to become unseaworthy would not deprive the shipowner of his insurance coverage absent a showing

---

9. The fire statute as interpreted by the Supreme Court in 1932 read:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner." Rev.Stat. § 4282, Act of March 3, 1851, c. 43 § 1, 9 Stat. 635 (46 U. S.C.A. § 182).

that the shipowner, in bad faith or neglect, knowingly allowed the ship to sail in the unseaworthy condition.

The second distinction between a breach of a nondelegable duty and a claim alleging bad faith or neglect, is the element of knowledge.

In a case which alleges bad faith or neglect of the shipowner, knowledge of a mat or crew member is not imputed to the shipowner. The Fifth Circuit Court of Appeals explains:

" . . . the proof shows nothing more than negligence on the part of the Master, Engineer and crew in failing to use the simple means at hard to make her seaworthy. New York & *Porto Rico S.S. Co. v. Aetna Ins. Co.,* supra. When Union speaks in terms of 'bad faith or want of ordinary prudence or diligence on the part of the insured or his agents,' it refers to those acts in which the owner, if an individual, personally participates, or if a corporation or multiple ownership, in which there is personal participation by those having shoreside managerial responsibilities. Consistent with the general pattern of legislative and judge-made admiralty law which, to encourage and foster shipping and maritime ventures, *Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co.,* 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612, 1927 A.M.C. 402; *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903, 1941 A.M.C. 430, distinguishes between acts of those in supervisory management and in normal operation, an insurance policy, as a contract made in that general atmosphere to meet the business needs of the shipping industry, should receive a parallel construction that neglect by agents or servants below the level of management will not be imputed on the usual notions of *respondeat superior.* In such a Time policy, it is only " * * * where, with the *privity of the assured,* the ship is sent to sea in an unseaworthy state [that], the insurer is not liable for any loss attributable to unseaworthiness," *Compania Transatlantica Centroamericana, S.A. v. Alliance Assurance Co.,* D.C.S.D.N.Y., 50 F.Supp. 986, 991, 1943 A.M.C. 976, 983.

*Saskatchewan Government Ins. Office v. Spot Pack, supra,* 242 F.2d 385, 390 (5th Cir. 1957).

 Therefore, this Court concludes that the negligence of Captain Taunton in allowing the UMI–1650 to sail in an unseaworthy condition is enough to establish liability of Universal Marine vis-a-vis Texaco inasmuch as Universal's duty to provide a seaworthy vessel is a nondelegable one. However, whatever knowledge Captain Taunton might have had concerning the unseaworthiness of the UMI–1650 will not be imputed to Universal Marine to establish that it, acting in bad faith or neglect, knowingly allowed the flotilla to sail in an unseaworthy condition. For the above reasons, the express warranty of seaworthiness as it applied to Insurance Company of North America was not breached by Universal Marine.

Accordingly, based on the above Findings of Fact and Conclusions of Law,

It is ordered that preparations proceed for trial on the issues of quantum, and, thereafter, judgment issue in accordance with these Findings of Fact and Conclusions of Law on the issue of liability.